

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-10-2002

# Lam v. Kelchner

Precedential or Non-Precedential: Precedential

Docket No. 00-3803

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Lam v. Kelchner" (2002). *2002 Decisions*. Paper 560.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/560

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed September 10, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 00-3803 / 00-4122

CHOI CHUN LAM

Appellant (00-4122)

v.

DONALD KELCHNER, Superintendent;
THE DISTRICT ATTORNEY OF THE COUNTY OF
LANCASTER; THE ATTORNEY GENERAL OF THE STATE
OF PENNSYLVANIA,

Appellants (00-3803)

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 98-cv-03109)
District Judge: Honorable Louis H. Pollak

Argued February 25, 2002

Before: ROTH and FUENTES, Circuit Judges
GIBSON,* Circuit Judge

(Opinion filed: September 10, 2002)

_____

* Honorable John R. Gibson, Senior Circuit Court Judge for the Eighth
Circuit, sitting by designation.

Leonard Sosnov, Esquire (Argued)
210 East Willow Grove Avenue
Philadelphia, PA 19118

 Counsel for Appellee/Cross-
Appellant

Donald R. Totaro
District Attorney
Susan E. Moyer (Argued)
Assistant District Attorney
Office of the District Attorney
Lancaster County Courthouse
50 North Duke Street
P.O. Box 83480
Lancaster, PA 17608-3480

 Counsel for Appellants/Cross-
Appellees

OPINION OF THE COURT

ROTH, Circuit Judge:

In this habeas appeal, we must decide if the Pennsylvania Superior Court was objectively unreasonable in ruling that petitioner Choi Chun Lam's responses to undercover government agents were voluntary and, thus, satisfied the requirements of due process. Lam gave incriminating responses after the agents threatened her with physical violence. These responses include her statements to the agents and a telephone call from her workplace to an alleged co-conspirator shortly thereafter. The record contains undisputed testimony that Lam was afraid of the agents' threats. The District Court found, therefore, that Lam's responses were involuntary, and it granted habeas relief based both on her responses and on the fruits of those responses. Applying the narrow scope of review available under 28 U.S.C. S 2254 (1996), we will affirm the District Court's decision to grant habeas relief based on Lam's responses, but we will reverse its decision to grant relief based on their fruits. We will also affirm the District Court's rejection of Lam's claims in her cross-

2

appeal that her Confrontation Clause and due process rights were violated by statements made by the prosecution and its witnesses during her murder trial.

I. FACTS AND PROCEDURAL HISTORY

Choi Chun Lam was convicted in state court of conspiring to murder Rong Rong Xu. Xu was married to Lam's ex-husband, Wing Cheng. The prosecution argued that Lam and an associate, Zu Long Xie, had hired Cho Yee Yeung, a member of the Chinese Fuk Ching gang, to kill Xu.

A. Undercover investigation.

Yeung was arrested by federal authorities in 1993 on charges unrelated to Xu's murder. He agreed to cooperate with the government as part of a plea bargain. Yeung then told the federal authorities that he and another man had been hired by Lam to kill Xu and that they had shot Xu on May 3, 1992, in the Peking Restaurant in Quarryville, Pennsylvania. Yeung claimed that Bick Yung Cheng, a friend of Lam's, and Xie, who worked for Bick Yung Cheng's family, had introduced him to Lam.

Both the Pennsylvania State Police and the Federal Bureau of Investigation investigated Xu's murder. In an attempt to corroborate Yeung, Special Agent Lee of the FBI and Trooper Pak Yuen of the Pennsylvania State Police posed as members of the Fuk Ching gang. On the evening of April 7, 1994, the undercover officers visited Lam while she was working at the China King Restaurant in Gilbertsville, Pennsylvania. While Lee and Yeun were speaking with Lam, only one or two customers were present

in the restaurant. The officers taped their 45-minute conversation with Lam.1

During the taped conversation, the officers told Lam that their brother, Yeung, helped her "do something" before, and that they were there to collect his money. They said that the remaining balance was $15,000. Lam professed that

---

1. Our description of the taped conversation is based on the transcript, translated fom Chinese, that the prosecution read into evidence at trial.

3

she did not know what they were talking about. The officers then told her that their brother said, "if you're not going to pay the rest of the money, both should be died together." Continuing, they stated that their brother would"expose the case." When Lam refused to pay, they asked her who the money should be collected from. They told Lam that the next time they would not be so polite . . . if "this money still has not been collected, you will be sorry."

Ultimately, when they asked why everyone in Chinatown said she had murdered Xu, Lam replied:

> I don't know. Maybe I have hatred with her very deep, deepest hatred with her is me . . . Everybody is looking at us. See what is happening. The FBI will come here every one month or two months. Many people said that I did this right now. The policeman said that my husband and I are conspired to do this matter. That make me don't know what to do. If I really do that, if I really do that, then maybe.

After making this statement, Lam continued to profess her lack of personal knowledge about the murder, saying that she really didn't "understand this matter" and that she didn't "do this matter" or "know [it] from the first beginning." When the discussion concluded without Lam's agreement to pay, one agent wrote down his beeper number and told her to call him if she changed her mind.

Telephone records reflected a call from the restaurant to Xie later that evening. The next day, Xie called Agent Lee on the beeper number that Lee had given Lam. Xie said that Lam agreed to pay the money if Yeung would not expose the case and Lee and Yeun would not go to the restaurant in the future. Bick Yung Cheng finally met the agents at an exit on the New Jersey turnpike and made a final payment to them.2

---

2. Because the state court failed to make specific factual findings in its determination that Lam's statements were voluntary, we have considered only the uncontested portion of the record in evaluating Lam's constitutional claim: "the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted." Columbe v. Connecticut, 367

B. State court suppression hearing and jury trial.

On April 27, 1994, the Pennsylvania State Police charged Lam, Bick Yung Cheng, and Zu Long Xie with criminal homicide in the death of Rong Rong Xu. All three defendants were tried jointly before a jury in March 1995.

Before trial, Lam moved to suppress the statements she gave to the undercover officers during the conversation at her restaurant. The court held a suppression hearing and considered testimony about the surrounding circumstances from Agent Lee, Trooper Yuen, and Lam. Lam testified that she believed that the officers were members of the Fuk Ching gang. Agent Lee also testified that he believed Lam thought they were associated with Fuk Ching. Finally, Lam gave undisputed testimony that the Fuk Ching had a reputation for kidnapping, extortion, and burglary and that she was "very scared" when she spoke with them.[3]

Lam's suppression motion was denied, and the court entered "a finding that [Lam's] will was not overborne by fear or threats during the April 7, 1994, contact by Special Agent Lee or Trooper [Yuen] under the totality of the circumstances test." At the trial, the prosecution read into evidence the entire transcript of the conversation between Lam and the undercover agents. Agent Lee then testified about the phone call he received the next day from Xie on

---

U.S. 568, 603-04 (1961) (on direct review, it was appropriate for Supreme Court to consider such evidence to fill in factual lacunae in state decision); James S. Liebman & Randy Hertz, 2 Federal Habeas Corpus Practice and Procedure S 30.3, p. 1315 (1998) (habeas cases apply same standard for review of incomplete factual findings by state courts) (hereinafter Liebman & Hertz). The Commonwealth appears to agree, as its brief states that all facts are to be derived from testimony of Lee, Yuen, Lam, and the transcript of their conversation.

3. At oral argument before us, the Commonwealth claimed that Lam admitted to a lack of fear on cross examination. Upon review of the transcript, we have found only a statement by Lam that she was "not scared" that the officers would report her to the police but that she was "afraid that . . . [the] Fuk Ching gang will come again to my restaurant and hurt me . . . ." Rather than establishing a lack of fear, this statement confirms Lam's fear of physical violence from the undercover officers.

the beeper number that Lee had given to Lam. The trial court issued a post-trial opinion reiterating its conclusion that Lam's statements were voluntary and properly admitted into evidence.

Also at the trial, Trooper Stanalonis of the Pennsylvania

State Police and Special Agent Troutmann of the FBI explained the methods they used to question Yeung and how they then concluded that he was telling the truth. Trooper Stanalonis testified that he believed Yeung was telling a "correct story corroborating my investigation." In addition, the prosecution read into evidence Yeung's plea agreement. This testimony is the basis for Lam's contention that the prosecution improperly vouched for Yeung's credibility.

On March 22, 1995, a jury found Lam and her co-defendant, Xie, guilty. The jury was unable, however, to reach a verdict as to Bick Yung Cheng. On March 24, Lam was sentenced to life imprisonment.

C. State appeals.

Lam brought a direct appeal in the Superior Court of Pennsylvania. The Superior Court affirmed Lam's conviction and rejected her allegations of constitutional error.

The Superior Court agreed that Lam's statements were voluntary. It did, however, acknowledge the government's threats of violence: "Although the Fuk Ching was known for violence, the agents' statements that they would not be as 'polite' next time, and that if she did not pay 'we will hold up together and die together,' were insufficient to overcome Appellant's will and self-determination. Appellant never wavered from her repeated contention that she did not know what the agents were referring to, nor did Appellant contact the police after the agents left."

In addition, the Superior Court rejected Lam's claim that her Confrontation Clause rights were violated by admission of testimony regarding Xie's offer of payment. Because Xie did not himself testify, Lam had no opportunity to cross-examine Xie. The Superior Court found that this was not a Confrontation Clause violation, however, as Xie's statement contained sufficient indicia of reliability. Namely, it found

that Xie's statement was spontaneous, against his penal interests, and would not be proven unreliable on cross examination.

The Superior Court also addressed the merits of Lam's vouching arguments in the context of her claim that trial counsel was ineffective.4 It rejected Lam's arguments that the prosecution's statements and testimony offered by Trooper Stanalonis and Special Agent Troutmann violated her fair trial rights. The court did, however, note that a small part of Trooper Stanalonis's testimony expressed "belief in Yeung's veracity at the time of the investigatory interview." The court ultimately dismissed this claim on the ground that it did not create unfair prejudice depriving Lam of a fair trial. Judge Cavanaugh dissented from this ruling and argued that the introduction of Yeung's plea agreement, as well as the vouching testimony offered by

Agent Troutmann and Officer Stanalonis, required a new trial.

Lam then petitioned the Pennsylvania Supreme Court for an allowance of appeal. She raised four federal issues in her petition: (1) the vouching by the prosecution was improper, (2) her counsel was ineffective for failing to object to the prosecution's vouching, (3) the admission of a statement by a non-testifying co-defendant was hearsay and violated the confrontation clause, and (4) Lam's statements to the police and the fruit of those statements should have been suppressed under the due process clause because they were involuntary. The Supreme Court denied Lam's request for an appeal on June 17, 1997.

D. Federal habeas proceedings.

Lam filed her habeas petition on June 16, 1998. The Magistrate Judge's initial report and recommendation denied all of her claims. On June 22, 1999, the District Court adopted the report to deny three of Lam's arguments,

_____

4. The Magistrate Judge found that Lam's vouching claim was addressed at length by the Pennsylvania Superior Court and was presented to the Pennsylvania Supreme Court in Lam's petition for allowance of appeal. Thus, it was not procedurally defaulted despite Lam's failure to object to vouching before the state trial court. Liebman & Hertz S 26.2e, p. 1075.

7

but it remanded the case for reconsideration of Lam's claim that her responses were involuntary.

On remand, the Magistrate Judge recommended that habeas relief be granted. His report concluded that Lam's responses were involuntary and that she should receive a new trial at which both her responses and the fruits of these responses were excluded. On October 20, 2000, the District Court issued a final order adopting the second recommendation. On December 18, 2000, the District Court ordered that Lam be released from prison and placed under house arrest.

II. JURISDICTION

The District Court had jurisdiction of Lam's habeas claim brought under 28 U.S.C. S 2254. We have appellate jurisdiction over the government's appeal of a final order under 28 U.S.C. SS 1291 and 2253. As to Lam's cross-appeal, a motions panel of this Court granted a certificate of appealability with respect to the three claims that the District Court had denied and we have jurisdiction pursuant to 28 U.S.C. SS 1291 and 2253(c)(2).

III. DISCUSSION

A. Habeas standards.

In 1996, Congress enacted the Anti-terrorism and
Effective Death Penalty Act of 1996 (AEDPA), codified at 28
U.S.C. S 2254, in which it imposed new constraints on the
federal courts' ability to grant habeas relief from state court
judgments. Under AEDPA, when a federal court reviews a
state court's ruling on federal law, or its application of
federal law to a particular set of facts, the state court's
decision must stand unless it is "contrary to, or an
unreasonable application of, clearly established Federal
law, as determined by the Supreme Court of the United
States." 28 U.S.C. S 2254(d)(1). When a federal court
reviews a state court's findings of fact, its decision must
stand unless "it was based on an unreasonable
determination of the facts in light of the evidence presented
in a State court proceeding." 28 U.S.C. S 2254 (d)(2).

8

The Supreme Court has provided authoritative guidance
on how federal courts are to review legal and mixed
determinations under S 2254 (d)(1). See Williams v. Taylor,
529 U.S. 362, 413 (2000). A state-court decision is
"contrary to" the Supreme Court's clearly established
precedent "if the state court applies a rule that contradicts
the governing law set forth in [Supreme Court] cases." Id. at
405. A decision is also contrary if it "confronts a set of facts
that are materially indistinguishable from a decision of this
Court and nevertheless arrives at a result different from our
precedent." Id. at 406.

The "unreasonable application" standard addresses a
different part of the court's analysis. It allows habeas relief
when the state court "correctly identifies the governing legal
rule but applies it unreasonably to the facts of a particular
prisoner's case." Id. at 407-08. This standard will be met if
the "state court's application of clearly established federal
law was objectively unreasonable." Id. at 409. It is not,
however, met by a merely "incorrect application of federal
law." Id. at 410.

B. Due process claims.

1. Whether Lam's statements were voluntary.

We will first address whether Lam's responses to the
undercover officers should have been suppressed because
they were involuntary. As we noted at the outset, these
responses include Lam's taped statement and the telephone
call from her workplace to alleged co-conspirator Xie that
same evening, which call was presumably made by Lam
and resulted in Xie learning Lee's beeper number.

The Due Process clauses of the Fifth and Fourteenth
Amendment bar the use of incriminating statements that
are involuntary.5 See generally LaFave et al. 2 Criminal

_____

5. Lam asserts a violation under the due process clause of the Fifth
Amendment, arguing that her responses to the agents were made in

violation of her Fifth Amendment right against self incrimination because they were the product of threats. We will not belabor the potential difference between the Fifth and Fourteenth Amendment's Due Process clauses, however, as the voluntariness inquiry is the same under each amendment: "any confession which was inadmissible because obtained in violation of the due process clause of the Fourteenth Amendment would likewise be subject to suppression under the Fifth Amendment due process clause." Wayne R. LaFave et al. 2 Criminal Procedure S 6.3(a), p.468 (2d ed. West 1999).

Procedure S 6.2(b), p. 444 (2d ed. West 1999). The voluntariness standard is intended to ensure the reliability of incriminating statements and to deter improper police conduct, id. at pp. 444-45. The ultimate issue of voluntariness is a legal question requiring an independent federal determination, Miller v. Fenton, 474 U.S. 104, 110 (1985). Thus, under the AEDPA habeas standard, we are required to determine whether the state court's legal determination of voluntariness was contrary to or an unreasonable application of Supreme Court precedent.

The Supreme Court has made clear that a statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion." Arizona v. Fulminante, 499 U.S. 279, 288 (1991). In determining whether a statement is voluntary, Supreme Court precedent requires consideration of "the totality of all the surrounding circumstances--both the characteristics of the accused and the details of the interrogation." Dickerson v. United States, 530 U.S. 428, 434 (2000) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). These surrounding circumstances include "not only the crucial element of police coercion, Colorado v. Connelly, 479 U.S. 157, 167 (1986)," but may also include "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health." Withrow v. Williams, 507 U.S. 680, 693 (1992) (some internal citations omitted).

The state appellate court relied on the totality of circumstances test when it examined whether Lam's will was overborne. Thus, its ruling was not contrary to Supreme Court precedent establishing the proper test for voluntariness. We do hold, however, that the state court was objectively unreasonable, under Arizona v. Fulminante, 499 U.S. 279 (1991), in concluding that Lam's statements were voluntary under the totality of circumstances surrounding the credible threats of violence by the undercover officers.

Fulminante required the Supreme Court to decide whether a government informant's credible threat of exposure to physical violence supported a conclusion, under the totality of circumstances, that the suspect's

subsequent responses were coerced. Fulminante , 499 U.S. at 287-88.6 The suspect in Fulminante was approached by a government informant while he was serving a prison sentence. The informant made an indirect threat of violence by saying that he would not protect Fulminante from other prisoners unless he confessed to his involvement in a crime different from the one resulting in his prison sentence. Id. at 288. The record contained evidence that Fulminante's personal characteristics were insufficient to render him impervious to that threat,7 although he had stipulated that he never "indicate[d] that he was in fear of other inmates nor did he ever seek Mr. Sarivola's 'protection'." Id. at 304. Despite that stipulation, the Supreme Court held that Fulminante's confession was involuntary based on the government's indirect threat and evidence that Fulminante was susceptible to the government's threat.

The circumstances confronting Fulminante pale in comparison to those confronting Lam. Undercover officers threatened Lam with gang violence unless she paid a $15,000 balance due on a murder-for-hire contract. 8 Thus,

_____

6. See also Payne v. Arkansas, 356 U.S. 560, 564-65 (1958) (confession was coerced where interrogating police officer promised protection from "angry mob" if suspect confessed); United States v. McCullah, 87 F.3d 1136, 1139 (10th Cir. 1996) (where government agent told a "drug-dependant" defendant that "he could be killed unless he told the informant 'what really happened,' " the court found a "classic Fulminante situation" rendering the confession involuntary).

7. The Court noted record evidence that Fulminante had low average intelligence, dropped out of school in fourth grade, was short in stature and had a slight build, and had felt threatened by the prison population and requested protective custody during prior incarcerations. Id. at 286 n.2.

8. The Magistrate Judge, in finding coercion, noted that it was within the realm of the possible to interpret the agents' threats as referring only to a threat of prosecution. This appears contrary to the Pennsylvania appellate court's understanding of the threats, however. The court noted that the Fuk Ching gang was "known for violence," and relied on the officers' statements that they would not be as polite next time they came to collect the money, and that if Lam did not pay"we will hold up together and die together." We see no reason to disregard the Pennsylvania court's understanding that the officers threatened not just exposure of, but also violence to Lam.

11

their threat to Lam was more direct than the threat leading to an involuntary confession in Fulminante. Nor does the record support the conclusion that Lam was impervious to the government's overreaching. Unlike Fulminante, Lam never stipulated to her lack of expressed fear. Rather, she gave undisputed testimony that she was scared that the undercover officers would physically harm her and that she believed that they were members of the Fuk Ching gang.

Lam also testified that Fuk Ching had a reputation for kidnapping, extortion, and burglary.

In addition, the record contains no evidence that Lam's personal characteristics would render her impervious to such a direct threat of physical violence. She is, however, a middle-aged woman who left China to go to Hong Kong for eight years; she then came to this country in 1988. She grew up in China -- a culture very different from the one in which she now found herself. After Lam left China, she raised three children without much support from her husband who had remarried Xu. She had no prior criminal record. At the meeting with Lee and Yeun, she believed that she was being threatened by a violent gang imported from the alien culture of China. We have no idea whether she understood that she could ask the American police to protect her from that gang. Indeed, Agent Troutmann testified at trial that Fuk Ching victims usually won't tell the FBI anything.

While these characteristics of Lam are not of the same type as the personal vulnerabilities the Fulminante case presents, we find this distinction unimportant in light of the fact that Lam presented uncontradicted testimony that she was actually afraid of the agents' threats of violence. Thus, the totality of circumstances presents a situation far more coercive to Lam than the one found unconstitutional in Fulminante. Lam's fear of the threats undermines the reliability of the incriminating responses she made.

The state courts failed to consider Fulminante in their analysis. The state trial court made no express findings of fact and concluded, with little explanation, that Lam's will was not overborne under the circumstances. The Pennsylvania Superior Court's discussion was brief and conclusory. We quote it in full:

12

Appellant's third issue concerns her own recorded conversation with Agent Lee which she contends should have been suppressed as having been obtained involuntarily in violation of the Due Process Clause of the Fifth Amendment of the United States Constitution. Appellant alleges that her statement was made under duress and coercion because the agents posed as members of a violent Asian gang. Appellant also seeks to suppress, based upon the fruit of the poisoned tree doctrine, evidence of the resulting phone calls to her co-defendants which emanated from her business, 9 the call from Xie to Agent Lee's beeper the next day, and any further contacts between Xie and the agents.

In reviewing a ruling of a suppression court, we must ascertain whether the record supports the court's factual findings. Commonwealth v. Hughes, 639 A.2d 763, 769 (Pa. 1994). In doing so, we may only consider the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. Id.

> If the record supports the court's findings, we may only reverse if the court drew an erroneous legal conclusion from the facts. Id.
>
> In order for a defendant's statements to be admissible, they must be freely and voluntarily given and must not be extracted by any sort of threats or violence. Commonwealth v. Nester, 661 A.2d 3, 5 (Pa. Super. 1995), allocatur granted 673 A.2d 333 (1996) [reversed 709 A.2d 879 (Pa. 1998) on grounds that the Superior Court had not acknowledged the totality of the circumstances]. The defendant's will must not have been overborne nor her capacity for self-determination critically impaired. Commonwealth v. Clark, 533 A.2d

---

9. Insofar as the Superior Court classifies the April 7 telephone call to Xie as a "fruit" of Lam's involuntary statement rather than as a reaction by Lam to the Fuk Ching threats, we believe that this classification is objectively unreasonable because the discovery of that telephone call was not made through evidence derived from the involuntary statement, see, e.g., Wong Sun v. United States, 371 U.S. 471, 487-88 (1963). If this call was in fact made by Lam (and we presume it was), it, as well as Lam's statements in the restaurant, was a reaction by Lam made as a direct result of the undercover officers' threats of physical violence.

13

> 1376, 1379 (Pa. 1987) (citing Commonwealth v. Smith, 368 A.2d 272 (Pa. 1977)).
>
> The suppression court held that Appellant's statements were made voluntarily. We agree. Although the Fuk Ching was known for violence, the agents' statements that they would not be as "polite" next time, and that if she did not pay "we will hold up together and die together," were insufficient to overcome Appellant's will and self-determination. Appellant never wavered from her repeated contention that she did not know what the agents were referring to, nor did appellant contact the police after the agents left.

(citations to Pennsylvania cases restated per Local Appellate Rule 28.3).

Thus, we see that the Superior Court did not consider Lam's admitted fear when it concluded that Lam spoke voluntarily. Instead, the Superior Court concluded that it could disregard the government's threat based on the facts that Lam "never wavered from her repeated contention that she did not know what the agents were referring to, nor did [she] contact the police after the agents left." As explained below, however, these factors cannot reasonably be considered determinative of a free will in light of the threats and of Lam's fear.

As an initial matter, we are troubled by the state court's reliance on Lam's assertions that she did not know what

the agents were referring to. A refusal to acknowledge the facts that the threat is intended to verify is not an indication that the person being threatened is not intimidated. In Brown v. Mississippi, 297 U.S. 278, 281 (1936), for example, Brown "still protested his innocence" after being hung twice, and still declined to confess when he was whipped immediately thereafter. Brown's protestation of innocence hardly shows that his eventual confession (given after another round of whipping the very next day) was voluntary. Similarly, Lam's professed ignorance of the reason for the undercover agents' visit does not establish that Lam spoke freely to the undercover officers.

14

Furthermore, the fact that Lam failed to call the police after the undercover officers left cannot reasonably support a finding of voluntariness. The failure to call the police does nothing to mitigate the officers' threats and Lam's testimony that she was afraid while she was being questioned by them. Her failure to take a particular action after they left cannot reasonably support a conclusion that Lam remained unaffected by the prospect of the physical violence with which they had threatened her. Indeed, Fuk Ching victims apparently do not seek aid from American law enforcement authorities. As Agent Troutmann testified, Fuk Ching victims don't talk to the FBI.

Under the totality of facts assumed by the state court, the only reasonable conclusion is that Lam's will was overborne by the officers' threats of violence. Because, therefore, her responses were made under duress, they cannot be used by the Commonwealth as evidence against her. The incriminating responses include Lam's reply when the undercover officers asked her why everyone else thought she had murdered Xu. Lam responded:

> I don't know. Maybe I have hatred with her very deep, deepest hatred with her is me . . . Everybody is looking at us. See what is happening. The FBI will come here every one month or two months. Many people said that I did this right now.

This response was the only evidence of motive on Lam's part. As a result it must be considered incriminating. See, e.g., Miranda v. Arizona, 384 U.S. 436, 477 (1966) ("[i]f a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution").

The April 7 telephone call from the restaurant to Xie after the undercover officers had left, was also incriminating. This call was presumably made by Lam. When Xie called Lee the next day, he used Lee's beeper number which Lee had given to Lam the night before. Thus, the April 7 call was the means to link Lam to Xie's statement that Lam had agreed to pay the money. The Commonwealth acknowledges in its opening brief that it was very important to its case to establish that Lam had passed on the beeper number to

Xie. Given that the April 7 call was made that same evening

after Lam was threatened by the officers, the call must be considered to have been made in reaction to those threats. Evidence of the call, either directly or by reference as the source of Xie's knowledge of Lee's beeper number, should have been suppressed.

In sum, in light of the threats and of the fear they caused, Lam's statements during the interview and the fact that someone (presumably Lam) telephoned Xie immediately afterwards must have been induced by these threats and, therefore, must have been involuntary. The state court's contrary determination was objectively unreasonable in light of the Supreme Court's holding in Fulminante.

2. Fruit of the poisonous tree.

The state appellate court did not address Lam's fruit of the poisonous tree argument after it rejected her initial challenge based on voluntariness.10 Because we find that Lam's responses were involuntary, we will address her further claim that the evidence derived from those involuntary responses, i.e., the fruit of that poisonous tree, should also be suppressed.11 The fruit at issue is Xie's April 8 phone call to Agent Lee in which Xie stated that Lam would pay the money if Yeung did not expose the case and Lee and Yeun did not return to the restaurant. Under the standard of review provided by AEDPA, however, we do not find ground for habeas relief based on Xie's statement.

Our primary concern with the fruit of the poisonous tree argument is that the Supreme Court has never held that

_____

10. Although Lam may not have objected to admission of these fruits in her suppression hearing, she did raise the argument before the court of appeals. The appellate opinion never suggests that the court was unwilling to consider the issue on the merits, and Lam raised this issue in her petition to the Pennsylvania Supreme Court. Thus, because it is not clear that the state appellate court considered the issue procedurally barred, see Liebman & Hertz S 26.2e, p. 1075-82, we will address the merits of this argument.

11. As we note in footnote 9, we consider the telephone call presumably made by Lam to Xie on the evening of April 7 to be a direct result of the threats made to Lam and not "fruits," i.e. , not evidence obtained from information gleaned from the coerced statement.

"fruits" of involuntary statements are inadmissible. LaFave et al., 3 Criminal Procedure S 9.5(a), p. 383 (2d ed. 1999). Historically, a coerced confession was considered to be unreliable but concrete evidence discovered with the aid of

that confession was reliable and thus admissible. Id. Over the years, however, a sense of "fair play and decency" has led courts to exclude not only the coerced confession but the real evidence discovered by virtue of the coerced confession. See, e.g., People v. Ditson, 369 P.2d 714 (Cal. 1962). Although a leading treatise argues that application of the fruit of the poisonous tree doctrine to involuntary confessions is "unquestionably correct," LaFave at 383, it is not clear that a decision to admit such evidence would violate the federal habeas standard -- that decision would not be contrary to, or an unreasonable application of, "clearly established law as determined by the Supreme Court." 28 U.S.C. S 2254(d)(1) (emphasis added).

The Supreme Court's explanation of S 2254(d)(1)'s requirements makes the problem clear. The state court's decision must violate "the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). In other words, "whatever would constitute an old rule under our Teague jurisprudence will constitute 'clearly established Federal law'," keeping in mind thatS 2254(d)(1) also "restricts the source of clearly established law to [the Supreme] Court's jurisprudence." Id. The state court's admission of Xie's statement in this case did not contradict or unreasonably apply Supreme Court precedent on admitting fruits of an involuntary statement because the Supreme Court has not recognized a right to suppress evidence discovered as a result of an involuntary statement. Although the magistrate judge cited circuit court precedent in support of that right,12 this is insufficient to meet the AEDPA's requirement of a right established by Supreme Court jurisprudence.

Thus, it is not clear that the violation alleged by Lam requires application of the exclusionary rule as to the fruits, at least under Supreme Court precedent. In light of

---

12. See, e.g., U.S. v. Downing, 665 F.2d 404 (1st Cir. 1981).

17

the cases above, as well as the fact that the Supreme Court has yet to base a suppression ruling on the fruits of an involuntary confession, we cannot say that suppression of Xie's statement was "dictated by [Supreme Court] precedent existing at the time [Lam's] conviction became final." Teague v. Lane, 489 U.S. 288, 301 (1989). The Pennsylvania courts would not have felt compelled by this precedent to conclude that the Constitution required suppression of the fruit. Gray v. J.D. Netherland, 518 U.S. 152, 166 (1996) (quoting Saffle v. Parks, 494 U.S. 484 (1990)).

The state court's rulings allowing Xie's statement into evidence, therefore, cannot be considered an objectively unreasonable application of Supreme Court precedent. Lam's habeas claim as to this evidence fails, and this part

of the District Court's ruling will be reversed.

3. Harmless error.

Because the state court found that Lam's statements were voluntary, it never reached the question whether admission of Lam's and Xie's statements amounted to harmless error. In this habeas appeal, however, the Commonwealth offers harmless error as another ground for denying habeas relief despite the state court's constitutional error.13 As explained below, however, we do not agree that the harmless error doctrine presents grounds to excuse the state court's unreasonable application of Fulminante and admission of Lam's responses.

The first flaw in the Commonwealth's harmless error argument is that it was never raised before the District Court and was therefore waived. Liebman & Hertz at S 32.2.a, p. 1315. (harmless error defense may be waived if the state fails to raise it in a timely and unequivocal fashion). The Commonwealth admits waiver and asks us to reach the matter sua sponte. Even if we did so, however, we would not reach a different result. In habeas cases, an error cannot be deemed harmless if it had a "substantial or injurious effect or influence in determining the jury's

_____

13. We have no need to address this argument with regard to the constitutionally admissible statements made by Xie.

18

verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (internal quotations omitted);14 Liebman & Hertz, S 32.1, p. 1327. Here, Lam alleges that error allowed the jury to consider a statement in which Lam expressed her hatred for Xu. Her expressed hatred established a motive for killing Xu -- an essential element of her conviction for murder. Error also allowed the admission of circumstantial evidence that someone (presumably Lam) telephoned Xie from Lam's workplace, following the conversation with Lee and Yeun, and furnished Xie with Lee's beeper number. As the government argues in its brief on appeal, it was very important to the government's case to establish that Lam passed on that beeper number to Xie.

From our description of the above evidence, it is clear that both responses supplied vital evidence for the Commonwealth's case against Lam and that these necessary elements of the Commonwealth's case were not met with evidence from any other source. Thus we will not excuse the admission of these responses as harmless error that failed to exert substantial influence on the jury's verdict.

C. Confrontation Clause claims.

On cross-appeal, Lam requests suppression of government testimony regarding Xie's statement that Lam

had agreed to pay the money if Yeung would not expose the case and if Lee and Yeun would not come back to the restaurant. She contends that admission of Xie's out-of-court statement violated her rights under the Confrontation Clause of the Sixth Amendment because she did not have

---

14. We note that a number of circuits have questioned whether the holding in Brecht survived the passage of AEDPA. See Noble v. Kelly, 246 F.3d 93, 101 n.5 (2d Cir. 2001) (gathering cases). This circuit has never addressed whether AEDPA requires habeas courts to ignore Brecht and instead determine whether a state court's finding of harmless error was "contrary to" or involved an "unreasonable application of " Chapman v. California, 386 U.S. 18, 24 (1967), which requires only that error be harmless beyond a reasonable doubt. We need not resolve this question, however, as the state's ruling cannot survive even the more generous standard articulated in Brecht. See, e.g., Anderson v. Cowan, 227 F.3d 893, 898 n.3 (7th Cir. 2000).

19

a chance to cross examine Xie. She relies on Supreme Court cases in which admission of unreliable hearsay evidence -- comprised of the confession of a co-defendant -- amounted to a violation of the Confrontation Clause. See Bruton v. United States, 391 U.S. 123 (1968); Lee v. Illinois, 476 U.S. 530, 544 n.5 (1986). We do not agree, however, that these cases require habeas relief excluding Xie's statement.

The state appellate court rejected Lam's Confrontation Clause argument on the ground that Xie's statement contained sufficient elements of reliability. It correctly noted that the admission of hearsay does not automatically equate to a violation of a defendant's rights under the Confrontation Clause. See Commonwealth v. Cull , 656 A.2d 476, 480 (Pa. 1995), which in turn relied upon the Supreme Court's plurality decision in Dutton v. Evans , 400 U.S. 74 (1970); accord Ohio v. Roberts, 448 U.S. 56, 66 (1980) (admission of hearsay does not violate the Confrontation Clause so long as there is "a showing of particularized guarantees of trustworthiness.").15  Rather, the concern under the Confrontation Clause is "a practical concern for the accuracy of the truth-determining process," and whether the statement exhibits sufficient indicia of reliability. Dutton, 400 U.S. at 88-89.

Having identified the correct legal principle, the state appellate court found Xie's statement reliable because it contained some of the same indicia of reliability present in Dutton: the statement was spontaneous, it was a statement against Xie's penal interest, and cross-examination would not render it unreliable.

As a result, we do not find that the admission of his statement was an unreasonable application of Supreme Court precedent, and we reject Lam's request for habeas relief under the Confrontation Clause.

---

15. Thus, we have no need to determine whether these statements fall under the federal hearsay exception for co-conspirators' statements under United States v. Inadi, 475 U.S. 387 (1986). In Inadi, the Supreme Court declined an invitation to revisit its resolution in Dutton, and held that co-conspirator statements are admissible without a showing that a co-conspirator is unavailable to testify. Id. at 400.

D. Fair trial and ineffective assistance of counsel claims.

Lam also argues on cross appeal that she was denied her due process right to a fair trial because the prosecution vouched for the credibility of certain government witnesses. On appeal, she focuses on two allegations of vouching. First, she argues that the testimony of investigating officers vouched for Yeung's credibility. Second, she argues that the prosecutor vouched for Yeung's credibility by relying on statements promising truthfulness in his plea agreement.16 Lam adds to this argument a claim that her trial counsel was ineffective because he failed to object to vouching at trial.

Vouching is a type of prosecutorial misconduct. It constitutes an assurance by the prosecuting attorney of the credibility of a government witness through personal knowledge or by other information outside of the testimony before the jury. United States v. Walker, 155 F.3d 180, 184 (3d Cir. 1998) (citing United States v. Lawn, 355 U.S. 339, 359 n.15 (1958)). In order to find vouching, two criteria must be met: (1) the prosecution must assure the jury that the testimony of a Government witness is credible, and (2) this assurance must be based on either the prosecutor's personal knowledge or other information that is not before the jury. Walker, 155 F.3d at 187.

On habeas review, however, prosecutorial misconduct such as vouching does not rise to the level of a federal due process violation unless it affects fundamental fairness of the trial. Liebman & Hertz S 9.1, p. 371. Thus, habeas relief is not available simply because the prosecutor's remarks were undesirable or even universally condemned. The relevant question for a habeas court is whether those remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 180-81 (1986) (quoting Donnelly

---

16. Lam also asserts that Troutmann improperly"vouched" for the prosecution's version of the events by giving improper opinion testimony. Lam's arguments do not, however, explain why such testimony would violate clearly established Supreme Court precedent prohibiting vouching.

v. DeChristophoro, 416 U.S. 637, 643 (1974)); accord Jackson v. Johnson, 194 F.3d 641, 653 (5th Cir. 1999).

1. The investigating officers' testimony.

Lam first challenges testimony that focused on Agent Troutmann's and Trooper Stanalonis's investigative techniques and how they ascertained whether Yeung was telling the truth. To be sure, their testimony has the effect of assuring the jury that Yeung is a credible witness. It is not clear, however, that all of the reasons for these assurances were not before the jury or that they were based only on the personal knowledge of the government officers. Rather, the officers told the jury about the techniques that led them to credit Yeung's statements during their investigation. The First Circuit has described this distinction as follows: An agent "could properly have testified as to the actions he took to corroborate .. . testimony," but he could not testify that certain statements were "lies," or that interrogation techniques had established the veracity of other statements. United States v. Rosario-Diaz, 202 F.3d 54, 65 (1st Cir. 2000). The state court applied a similar legal framework, and we find that it was reasonable in concluding that statements made by Agent Troutmann are not vouching.

A statement by Trooper Stanalonis, however, presents a clearer instance of vouching. On cross-examination, Stanalonis testified as to his personal belief that Yeung was telling him a "correct story corroborating my investigation." Stanalonis made this statement when he was asked whether he knew if Yeung's story was true during their first meeting, at a point when they were going over photos of suspects and Yeung identified Lam. Stanalonis also stated that Yeung's responses "heightened my thoughts on how truthful he was being with me." His statements have the impermissible effect of putting the prestige of Trooper Stanalonis's professional knowledge behind Yeung's testimony, a conclusion with which the Pennsylvania Superior Court agreed, noting that "it might have been more prudent to excise the reference to truthfulness."

Despite its concern about Trooper Stanalonis's testimony, however, the Pennsylvania Superior Court dismissed this

22

issue on the ground that Stanalonis's vouching did not create unfair prejudice depriving Lam of a fair trial. It reasoned that Stanalonis's testimony was not even harmful because his "testimony concerning Yeung's truthfulness was substantially similar to that of Agent Troutmann's," it was "a single, unsolicited remark made in passing," and his vouching was not related to a contested issue in the case, as it merely involved Yeung's identification of Lam. Likewise, the Supreme Court has previously denied habeas relief where it found an ambiguous, isolated comment by a prosecutor insufficient to render an entire trial unfair. Donnelly v. DeChristophoro, 416 U.S. 637, 645 (1974).

Under this precedent, we see no reason to find the Pennsylvania Superior Court's determination objectively unreasonable.17

2. The prosecutor's statements about Yeung's plea agreement.

Lam also challenges the prosecutor's reading into evidence of Yeung's plea agreement and the prosecutor's remarks about the consequences facing Yeung if he did not tell the truth. We will not disturb the state court's determination that neither of these statements constitute impermissible vouching.

As an initial matter, Lam does not point out a portion of the plea agreement that has the improper effect of assuring the jury that Yeung's testimony is credible. Rather, the portion of the plea agreement cited by Lam leaves open the possibility that Yeung's statements are false: Yeung and his family will receive protection "if it is further found that . . . [his] truthful cooperation . . . reveals" activities of individuals who may use violence against his family.

The prosecutor's statements also withstand habeas review. The prosecutor told the jury that Yeung would "risk his life" by not telling the truth in his plea agreement. This statement should not be considered improper, as we have approved a prosecutor's use of less subtle statements

_____

17. Because we find only one instance of impermissible vouching, we have no need to consider Lam's argument that multiple instances of vouching resulted in cumulative error that rendered her trial unfair.

23

addressing the consequences of a witness's failure to testify truthfully. See, e.g., United States v. Oxman, 740 F.2d 1298 (3d Cir. 1984), reversed on other grounds sub nom. United States v. Pflaumer, 473 U.S. 922 (1985)). Thus, we see no basis for habeas relief based on the state appellate court's approval of those statements.

3. Ineffective assistance.

Finally, Lam claims that her trial counsel was ineffective because he failed to object to impermissible vouching at trial. We reject this claim.

An ineffective assistance claim brought under the Sixth Amendment requires two showings: first, that counsel's performance was constitutionally deficient, and second, that the deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). Lam has failed to show any prejudice from trial counsel's performance, as the state appellate court considered Lam's vouching arguments despite trial counsel's failure to object. Thus, the District Court's rejection of this argument should be affirmed.

IV. CONCLUSION

Lam has established that she is entitled to habeas relief on her due process claim involving the voluntariness of her April 7 statement and the April 7 telephone call to Xie. It was objectively unreasonable, in light of the Supreme Court's holding in Arizona v. Fulminante, 499 U.S. 279 (1991), for the Pennsylvania Superior Court to find those responses voluntary.

We will, therefore, affirm that part of the District Court's October 20 ruling granting habeas relief based on Lam's responses to the undercover officers. We will reverse that part of its ruling granting habeas relief based on Xie's statements. We will also affirm the District Court's earlier order denying habeas relief based on Lam's Confrontation Clause and due process claims related to vouching.

24

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

25