DENNIS, Circuit Judge,
Concurring in the Judgment and Assigning Additional Reasons:
In this case we must decide whether petitioner, Billy Ray Nelson, was sentenced to death in violation of the Eighth Amendment because the jury was not instructed that it could consider and give effect to his mitigating evidence by deciding between the death penalty or a lesser sentence of life imprisonment. The three-judge panel of this court concluded that Nelson’s death penalty must be affirmed, but its members did not agree upon a majority rationale or opinion. Chief Judge Jones issued an opinion concluding that the pre-1991 Texas capital sentencing statute as applied to Nelson’s mitigating evidence and case did not violate the Eighth Amendment and affirming the district court’s judgment denying Nelson’s federal habeas corpus petition. I filed an opinion concurring in that result, concluding that, under the Supreme Court’s decisions in Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (“Penry I”) and other cases, because Nelson had introduced relevant mitigating evidence of impairment by mental disease, childhood abuse, and chemical abuse and dependency, the State’s use of the pre-1991 Texas statutory scheme to sentence him to death violated his constitutional rights. However, I concluded that under the harmless error test of Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the constitutional violation was harmless error. Judge Stewart also concurred in the result, but he did not join either opinion or assign reasons.
After rehearing the case en banc, the majority of this court has now decided that the application of the pre-1991 Texas statutory capital sentencing scheme to Nelson’s case violated the Eighth Amendment and that this violation cannot be disregarded as harmless error. I join fully in the majority’s conclusions and agree substantially with its reasons. The majority’s analysis of Nelson’s Penry I claim is similar to that set forth in my separate panel opinions here and in other cases.[1] Accordingly, I join the majority’s decision and assign additional reasons hereafter.
On the harmless error issue, I acknowledge my mistake at the panel level in undertaking a harmless error analysis of the constitutional defect in this ease. After considering the parties’ briefs and conducting my own additional research, I now see that (1) the State waived its harmless *317 error argument by not urging it prior to this en banc rehearing and (2) the constitutional deficiency in the capital sentencing mechanism as applied to this case was a structural defect, not a mere constitutional trial error, and therefore cannot be subjected to harmless error analysis.[2] The reasons for these conclusions are set forth in the final section of this opinion.
1. The Eighth Amendment Requirement Of Individualized Sentencing Obliges States, Including Texas, To Enable Capital Sentencers To Select The Appropriate Penalty After Full Consideration Of The Defendant’s Mitigation Evidence.
The Supreme Court’s recognition of the constitutional requirements regarding individualized sentencing began in 1976, when the Court issued a series of major decisions concerning the constitutionality of the death penalty that altered the fundamentals of the Court’s death penalty jurisprudence.[3] These cases dealt with death penalty statutes enacted by various states in response to the Supreme Court’s decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), which had previously invalidated the death penalty. None of the five cases produced a majority opinion, but several major, enduring principles nevertheless emerged from these cases. First, states cannot make the imposition of the death penalty mandatory from any class of crimes. See Woodson, 428 U.S. at 302-05, 96 S.Ct. 2978; Roberts, 428 U.S. at 335-36, 96 S.Ct. 3001; see also Sumner v. Shuman, 483 U.S. 66, 74, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987). Second, state death penalty statutes must limit and guide the sentencer’s discretion to impose the death penalty in order to prevent its arbitrary and capricious application. See, e.g., Johnson v. Texas, 509 U.S. 350, 360, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) (“In the five cases, the controlling joint opinion of three Justices reaffirmed the principle of Furman that ‘discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.’ ”) (quoting Gregg, 428 U.S. at 189, 96 S.Ct. 2909). Third, the capital sentencer must be allowed to consider and give effect to the unique circumstances of the individual defendant and his particular crime when determining the appropriate sentence. See, e.g., Shuman, 483 U.S. at 74, 107 S.Ct. 2716 (“In the two cases striking down as unconstitutional mandatory capital-sentencing statutes, the opinions stressed that one of the fatal flaws in those *318 sentencing procedures was their failure to permit presentation of mitigating circumstances for the consideration of the sentencing authority.”)- These underlying principles have continued to guide the Supreme Court’s death penalty jurisprudence.
Prior to Penry I, and certainly before Nelson’s conviction became final in 1994, the relevant Supreme Court decisions had clearly established the Eighth Amendment requirement of individualized sentencing in capital cases. See, e.g., McCleskey v. Kemp, 481 U.S. 279, 303-04, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (noting that “the Court has imposed a number of requirements on the capital sentencing process to ensure that capital sentencing decisions rest on the individualized inquiry contemplated in Gregg” and stating that “the Constitution limits a State’s ability to narrow a sentencer’s discretion to consider relevant evidence that might cause it to decline to impose the death sentence”); Zant v. Stephens, 462 U.S. 862, 879, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (“What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime.”); Eddings v. Oklahoma, 455 U.S. 104, 113-14, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (holding that the capital sentencer may not be prevented from considering any relevant mitigating evidence presented by the defendant); Bell v. Ohio, 438 U.S. 637, 642, 98 S.Ct. 2977, 57 L.Ed.2d 1010 (1978) (plurality opinion) (same); Lockett v. Ohio, 438 U.S. 586, 604-05, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion) (same). That is, in order to constitutionally impose and carry out the death penalty, a capital sentencer must at least be enabled (although it need not be instructed) (1) to make an individualized assessment of the defendant’s moral culpability and deathworthiness, based on a full consideration of each defendant’s mitigating evidence, as well as the character and record of the individual offender and the circumstances of the particular offense; and (2) to give full effect to that evidence by selecting the appropriate sentence, either life imprisonment or death, according to each defendant’s level of moral culpability and deathworthiness. See Cole, 443 F.3d at 443-44 (Dennis, J., dissenting); Nelson, 442 F.3d at 303-06 (Dennis, J., concurring in the judgment); Tennard, 284 F.3d at 599-601 (Dennis, J., dissenting).
Nor is the Eighth Amendment’s concern with individual culpability limited to the selection phase;[4] rather, the principle that capital punishment must be reserved for the most culpable perpetrators of the most serious crimes “is implemented throughout the capital sentencing process.” Roper v. Simmons, 543 U.S. 551, 568, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). Indeed, the imperative that only the most culpable offenders be sentenced to death has also long animated the Court’s decisions holding that certain classes of crimes and offenders are categorically ineligible for the death penalty, including persons under the age of 18 at the time of their crime, see id. at 569-75, 125 S.Ct. 1183 (holding that reduced culpability of juveniles “demonstrate[s] that juvenile offenders cannot with reliability be classified among the worst offenders”); see also Thompson v. Oklahoma, 487 U.S. 815, 835, 836-38, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (plurali *319 ty opinion) (prohibiting imposition of death penalty for persons under 16 at the time of their crime; “The reasons why juveniles are not trusted with the privileges and responsibilities of an adult also explain why their irresponsible conduct is not as morally reprehensible as that of an adult.”); the mentally retarded, see Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (“Their deficiencies do not warrant an exemption from criminal sanctions, but diminish their personal culpability.”); persons convicted of raping an adult woman, see Coker v. Georgia, 433 U.S. 584, 598, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (“Rape is without doubt deserving of serious punishment; but in terms of moral depravity and of the injury to the person and to the public, it does not compare with murder, which does involve the unjustified taking of human life.”); murderers whose killings do not involve an elevated level of moral depravity or any other aggravating circumstance, see Godfrey v. Georgia, 446 U.S. 420, 433, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (plurality opinion) (reversing death sentence where “[t]he petitioner’s crimes cannot be said to have reflected a consciousness materially more ‘depraved’ than that of any person guilty of murder”); and persons convicted of felony murder who lack a sufficiently culpable mental state, see Enmund v. Florida, 458 U.S. 782, 798, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (“Enmund[’s] ... culpability is plainly different from that of the robbers who killed; yet the State treated them alike and attributed to En-mund the culpability of those who killed the Kerseys. This was impermissible under the Eighth Amendment.”).[5]
2. Penry I Recognized That The Eighth Amendment Requires A Capital Sentencing Jury To Have The Ability To Both Consider And Give Effect To All Relevant Mitigating Evidence In Choosing A Sentence.
Given the pre-existing Eighth Amendment requirement that a capital sentencer must have individualized sentencing capability, it is not surprising that the Supreme Court in Penry I held that the Texas sentencing scheme was unconstitutional as applied when the Texas courts’ reading of the statute did not permit the jury as sentencer to either assess the defendant’s culpability or select the appropriate sentence. Consistent with the well established individualized sentencing principles that it had held to be required by the Eighth Amendment, the Supreme Court in Penry I held:
Underlying Lockett and Eddings is the principle that punishment should be directly related to the personal culpability of the criminal defendant. If the sen-tencer is to make an individualized assessment of the appropriateness of the death penalty, “evidence about the defendant’s background and character is relevant .... ” Moreover, Eddings makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence. Only then can we be sure that the sentencer has treated the defendant as a “uniquely individual human bein[g]” and has made a reliable determination that death is the appropriate sentence. “Thus, the sentence imposed at the penalty stage should re- *320 fleet a reasoned moral response to the defendant’s background, character, and crime.”
Penry I, 492 U.S. at 319, 109 S.Ct. 2934 (italics in original) (emphasis added) (internal citations omitted). In Penry I, “[t]he State conceded at oral argument ... that if a juror concluded that Penry acted deliberately and was likely to be dangerous in the future, but also concluded that because of his mental retardation he was not sufficiently culpable to deserve the death penalty, that juror would be unable to give effect to that mitigating evidence under the instructions given in this case.” Id. at 326, 109 S.Ct. 2934. Consequently, the Court held that “in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry’s mental retardation and abused background by declining to impose the death penalty ... the jury was not provided with a vehicle for expressing its ‘reasoned moral response’ to that evidence in rendering its sentencing decision.” Id. at 328, 109 S.Ct. 2934 (emphasis added).
3. The Supreme Court Has Consistently Reaffirmed Penry I’s Holding That A Capital Sentencing Jury Must Be Able To Consider And Give Effect To All Relevant Mitigating Evidence In Selecting A Sentence.
In its immediately following 1990 term, the Supreme Court repeatedly reaffirmed and applied the holding of Penry I, i.e., that the Eighth Amendment requires that the capital sentencer be able to consider and give effect to all relevant mitigating evidence in selecting and imposing the appropriate life or death sentence. See Boyde v. California, 494 U.S. 370, 377-78, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) (“The Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by petitioner.”) (citing, inter alia, Penry I); McKoy v. North Carolina, 494 U.S. 433, 443, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) (“As the Court stated in [Penry /]•'•••• ‘ “[T]he Constitution limits a State’s ability to narrow a sentencer’s discretion to consider relevant evidence that might cause it to decline to impose the death sentence.” Indeed, it is precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant’s character or record or the circumstances of the offense.’ ”) (internal citation omitted); Saffle v. Parks, 494 U.S. 484, 491, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990) (“In Penry, we held that resolution of a claim that the Texas death penalty scheme prevented the jury from considering and giving effect to certain types of mitigating evidence did not involve the creation of a new rule under Teague. See Penry, 492 U.S. at 315, 109 S.Ct. 2934[ ]. To the extent that Penry’s claim was that the Texas system prevented the jury from giving any mitigating effect to the evidence of his mental retardation and abuse in childhood, the decision that the claim did not require the creation of a new rule is not surprising. Lockett and Eddings command that the State must allow the jury to give effect to mitigating evidence in making the sentencing decision; Penry’s contention was that Texas barred the jury from so acting.”); Blystone v. Pennsylvania, 494 U.S. 299, 304-05, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990) (“Last Term, we elaborated on this principle, holding that ‘the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant’s background and character or the circumstances of the crime.’ Penry v. Lynaugh, 492 U.S. 302, 328, 109 S.Ct. 2934, 106 L.Ed.2d 256[ ] (1989)”).
*321 Through the 1990s, the Court continued to ratify the Penry I requirement that the capital sentencing jury must able to consider and give effect to the defendant’s relevant mitigating evidence in selecting and imposing the appropriate sentence. See Payne v. Tennessee, 501 U.S. 808, 822, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (“We have held that a State cannot preclude the sentencer from considering ‘any relevant mitigating evidence’ that the defendant proffers in support of a sentence less than death .... [Vjirtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances ....”) (internal citations omitted); Buchanan v. Angelone, 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998) (“In the selection phase, our cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence. [citing Penry I, Eddings, and Lockett].... Our consistent concern has been that restrictions on the jury’s sentencing determination not preclude the jury from being able to give effect to mitigating evidence.”).
In Penry v. Johnson, 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) (“Penry IP’), the Supreme Court emphatically reaffirmed and applied the rule of Penry I. The Court held that in Penry I it had “confirm[ed] that in a capital case, ‘[t]he sentencer must ... be able to consider and give effect to [mitigating] evidence in imposing sentence,’ ” so that “the sentence imposed ... reflects] a reasoned moral response to the defendant’s background, character, and crime.” Id. at 788, 121 S.Ct. 1910 (quoting Penry I, 492 U.S. at 319, 109 S.Ct. 2934) (alterations in original). The Court in Penry II made clear that a Texas court violates the rule of Penry I and the Eighth Amendment when it only allows the jury to use relevant mitigating evidence to answer the special issues without also allowing it to use such evidence to select the appropriate life or death sentence. The Penry II Court explained “the key under Penry /” as follows:
Penry I did not hold that the mere mention of “mitigating circumstances” to a capital sentencing jury satisfies the Eighth Amendment. Nor does it stand for the proposition that it is constitutionally sufficient to inform the jury that it may “consider” mitigating circumstances in deciding the appropriate sentence. Rather, the key under Penry I is that the jury be able to “consider and give effect to [a defendant’s mitigating] evidence in imposing sentence.” 492 U.S., at 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (emphasis added). See also Johnson v. Texas, 509 U.S. 350, 381, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) (O’CONNOR, J., dissenting) (“[A] sentencer [must] be allowed to give full consideration and full effect to mitigating circumstances” (emphasis in original)). For it is only when the jury is given a “vehicle for expressing its ‘reasoned moral response’ to that evidence in rendering its sentencing decision,” Penry I, 492 U.S., at 328, 109 S.Ct. 2934, 106 L.Ed.2d 256, that we can be sure that the jury “has treated the defendant as a ‘uniquely individual human bein[g]’ and has made a reliable determination that death is the appropriate sentence,” id., at 319, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (quoting Woodson v. North Carolina, 428 U.S. 280, 304, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976)).
Penry II, 532 U.S. at 797, 121 S.Ct. 1910.
Applying the rule of Penry I again, the Court in Penry II held that the pre-1991 Texas capital sentencing scheme was unconstitutional as applied in Penry’s second capital sentencing for essentially the same *322 reasons it was constitutionally defective the first time. The state trial court had attempted to cure the constitutional deficiency with an ad hoc supplemental instruction, but that instruction did not pass muster under the rule of Penry I because it did not clearly inform the jurors that they were legally empowered to consider and give effect to Penry’s mitigating evidence in selecting and imposing the appropriate life or death sentence. As the Pen-ry II court stated, repeating the words of Penry I: “ ‘[A] reasonable juror could well have believed that there was no vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence.’ ” Id. at 804, 121 S.Ct. 1910 (quoting Penry I, 492 U.S. at 326, 109 S.Ct. 2934).
In 2004, the Supreme Court twice reaffirmed the rule of Penry I in Texas death penalty cases. In Tennard v. Dretke, 542 U.S. 274, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004), and Smith v. Texas, 543 U.S. 37, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004), the Court confirmed Penry 7’s vitality and restated the rules governing its application. Tennard and Smith made plain that the inquiry that this court must undertake in a Penry case is simply to consider whether the defendant’s evidence is relevant (ie., whether it tends to prove or disprove any fact that the sentencer might deem mitigating), and, if so, determine whether the special issues inhibit the jury’s ability to consider and give effect to that evidence. Tennard and Smith also clearly instructed both this court and the Texas courts to refrain from placing restrictive glosses on the Court’s jurisprudence and creating unwarranted impediments to Penry claims.
In Tennard, the Court first summarized the rules of federal law it had recognized in Penry I, that: (1) the pre-1991 Texas capital sentencing scheme “provided a constitutionally inadequate vehicle for jurors to consider and give effect to the mitigating evidence of mental retardation and childhood abuse .... ” Tennard, 542 U.S. at 276, 124 S.Ct. 2562; (2) ‘“it is not enough simply to allow the defendant to present mitigating evidence to the sentencer ... ’ ” but rather “ ‘[t]he sentencer must also be able to consider and give effect to that evidence in imposing sentence,’ ” id. at 278, 124 S.Ct. 2562 (quoting Penry I, 492 U.S. at 319, 109 S.Ct. 2934); (3) the “give effect to” language of Penry I was “the key” to that decision, id. at 278, 124 S.Ct. 2562; (4) the same two special issues that were presented to Tennard’s jury were “insufficient for the jury in Penry’s case to consider and give effect to Penry’s evidence of mental retardation and childhood abuse,” id.) (5) Penry’s mental retardation evidence “ ‘had relevance to [his] moral culpability beyond the scope of the [deliberateness] special verdict questio[n]’ because ‘[p]ersonal culpability is not solely a function of a defendant’s capacity to act “deliberately,” ’ ” id. at 278-79, 124 S.Ct. 2562 (quoting Penry I, 492 U.S. at 322, 109 S.Ct. 2934) (alterations in original); (6) Penry’s mental retardation evidence “was relevant to the future dangerousness special issue ‘only as an aggravating factor,’ ” id. at 279, 124 S.Ct. 2562 (quoting Penry I, 492 U.S. at 323, 109 S.Ct. 2934); and (7) “the two special issues simply failed to ‘provide a vehicle for the jury to give [the evidence of childhood abuse] mitigating effect.’ ” Id. (quoting Penry I, 492 U.S. at 322-24, 109 S.Ct. 2934).
The Tennard court next called upon us to comply with the rules of federal law it had established concerning the introduction and use by the sentencing body of a defendant’s mitigating evidence in a capital case. It adduced its holding in McKoy that in capital cases the “meaning of relevance is no different in the context of mitigating evidence ... than in any other context, and thus the general evidentiary *323 standard — any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence — applies.” Tennard, 542 U.S. at 284, 124 S.Ct. 2562 (quoting McKoy, 494 U.S. at 440, 110 S.Ct. 1227) (internal quotation marks omitted). Then, the Court in Tennard recognized the effects of its previous holdings regarding the relevance standard in capital cases. “Once this low threshold for relevance is met, the ‘Eighth Amendment requires that the jury be able to consider and give effect to’ a capital defendant’s mitigating evidence.” Id. at 285, 124 S.Ct. 2562 (quoting Boyde, 494 U.S. at 377-78, 110 S.Ct. 1190).
Further, the Court commented on and quoted from its opinion in Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), regarding its rules about the introduction and use of relevant mitigating evidence. “We have never denied that gravity has a place in the relevance analysis, insofar as evidence of a trivial feature of the defendant’s character or the circumstances of the crime is unlikely to have any tendency to mitigate the defendant’s culpability.” Tennard, 542 U.S. at 286, 124 S.Ct. 2562 (citing Skipper, 476 U.S. at 7 n. 2, 106 S.Ct. 1669). “However, to say that only those features and circumstances that a panel of federal appellate judges deems to be ‘severe’ (let alone ‘uniquely severe’) could have such a tendency is incorrect. Rather, the question is simply whether the evidence is of such a character that it ‘might serve “as a basis for a sentence less than death.” ’ ” Id. at 287, 124 S.Ct. 2562 (quoting Skipper, 476 U.S. at 5, 106 S.Ct. 1669).
The Tennard court also held that the Fifth Circuit had erred in creating and applying its own restrictive gloss — its “constitutional relevance” rule[6] — as a threshold screening test to truncate its judicial review, rather than applying the federal rules clearly established by the Court’s decisions to the defendant’s mitigating evidence and Penry claim. The Court disapproved of the “constitutional relevance” rule as “ha[ving] no foundation in the decisions of this Court. Neither Penry I nor its progeny screened mitigating evidence for ‘constitutional relevance’ before considering whether the jury instructions comported with the Eighth Amendment.” Id. at 284, 124 S.Ct. 2562.
Finally, the Tennard court held that evidence of impaired intellectual functioning is obviously evidence under the clearly established relevance standard that “ ‘might serve “as a basis for a sentence less than death,”’ ” id. at 287, 124 S.Ct. 2562 (quoting Skipper, 476 U.S. at 5, 106 S.Ct. 1669), and that “[t]he relationship between the special issues and Tennard’s low IQ evidence has the same essential features as the relationship between the special issues and Penry’s mental retardation evidence. Impaired intellectual functioning has mitigating dimension beyond the impact it has on the individual’s ability to act deliberately.” Id. at 288, 124 S.Ct. 2562 (citing Penry I, 492 U.S. at 322, 109 S.Ct. 2934).
Justice O’Connor wrote the opinion for a six-member majority in Tennard, and was joined by Justices Stevens, Kennedy, Souter, Ginsburg and Breyer.
Shortly after Tennard, in Smith, the Supreme Court reiterated that the standard relevance test governs the admission *324 and use of mitigating evidence in capital cases. The Smith court also reaffirmed the rule “that the jury must be given an effective vehicle with which to weigh mitigating evidence so long as the defendant has met a low threshold for relevance, which is satisfied by evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.” Smith, 543 U.S. at 44, 125 S.Ct. 400 (quoting Tennard, 542 U.S. at 284-85, 124 S.Ct. 2562) (internal quotation marks omitted).
In Smith, the defendant had presented evidence that (1) he had potentially organic learning disabilities and speech handicaps; (2) he had a verbal IQ of 75, a full IQ of 78, and had been in special education classes in school; (3) his behavior at school was often exemplary, notwithstanding his low IQ and learning disabilities; (4) his father was a drug addict and violent criminal who regularly stole money from his family to support his drug addiction; and (5) he was only 19 years old at the time of his crime. Id. at 41, 125 S.Ct. 400. According to the Smith court, “[t]hat petitioner’s evidence was relevant for mitigation purposes is plain under our precedents, even those predating Tennard.” Id. at 45, 125 S.Ct. 400 (citing Penry I, 492 U.S. at 319-22, 109 S.Ct. 2934, Payne, 501 U.S. at 822, 111 S.Ct. 2597, Boyde, 494 U.S. at 377-78, 110 S.Ct. 1190, and Eddings, 455 U.S. at 114, 102 S.Ct. 869). Having found the evidence relevant, the Court stated that “the Eighth Amendment required the trial court to empower the jury with a vehicle capable of giving effect to that evidence.” Id.; see also id. at 46, 125 S.Ct. 400 (noting that Penry II “held that ‘the key under Penry I is that the jury be able to “consider and give effect to [a defendant’s mitigation] evidence in imposing sentence” ’ ”) (quoting Penry II, 532 U.S. at 797, 121 S.Ct. 1910).
Seven members of the Court joined the per curiam opinion in Smith, including Chief Justice Rehnquist and Justices O’Connor, Stevens, Kennedy, Souter, Ginsburg, and Breyer. Justice Scalia, joined by Justice Thomas, dissented, saying only that he would affirm the judgment of the Texas Court of Criminal Appeals and adhering to his longstanding position in Walton v. Arizona, 497 U.S. 639, 673, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) (Scalia, J., concurring in part and concurring in the judgment), of not “vot[ing] to uphold an Eighth Amendment claim that the sen-tencer’s discretion has been unlawfully restricted.” See Smith, 543 U.S. at 49, 125 S.Ct. 400 (Scalia, J., dissenting).
Finally, in 2006, the Court again confirmed the Penry I rule requiring that a capital sentencing jury be able to consider and give effect to relevant mitigating evidence in the selection of the appropriate life or death sentence. See Oregon v. Guzek, 546 U.S. 517, 126 S.Ct. 1226, 1228, 163 L.Ed.2d 1112 (2006) (“The Eighth Amendment insists upon ‘ “reliability in the determination that death is the appropriate punishment in a specific case.” ’ The Eighth Amendment also insists ‘that a sentencing jury be able “to consider and give effect to mitigating evidence” about the defendant’s “character or record or the circumstances of the offense.” ’ ”) (quoting Penry I, 492 U.S at 327-28, 109 S.Ct. 2934) (internal citations omitted).
In sum, the Supreme Court has continued to reaffirm and apply the Pewry I rule in many cases since its inception in 1989, has recognized its application to cases involving such relevant mitigating evidence as impaired intellectual function, low IQ, troubled and abusive childhood, participation in special education classes, and mental retardation, and has developed numerous auxiliary jurisprudential rules in *325 support of the application of the Penry I rule.
4. The Court’s Cases Demonstrate That Johnson Does Not Change or Limit The Penry I Rule; It Merely Establishes Auxiliary Principles Relating To Its Application.
Contrary to the argument by the State and my dissenting colleagues, the Supreme Court in Johnson did not change or limit the Penry I rule that the Eighth Amendment requires that a capital sentencing jury must be able to give full consideration and effect to all of a defendant’s relevant mitigating evidence in imposing the appropriate life or death sentence. In Johnson, the Court merely recognized three auxiliary principles for implementing the Penry I rule: (1) Because of the unique manner in which youth mitigation evidence aligns the inquiry into future dangerousness with an assessment of culpability or deathworthiness, a defendant’s relevant mitigating evidence of youth may be given full consideration and effect by the jury’s answer to the future dangerousness special issue; (2) In order to determine whether a Penry violation occurred, a reviewing court must ask whether there is a reasonable likelihood that the jury has applied the special issues in a way that prevents it from giving full consideration and effect to any relevant mitigating evidence; and (3) the state may shape and structure the jury’s consideration so long as it does not preclude the jury from giving effect to any relevant mitigating evidence, because, as the Court subsequently explained, “[o]ur consistent concern has been that restrictions on the jury’s sentencing determination not preclude the jury from being able to give effect to mitigating evidence.” Buchanan v. Angelone, 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998).
That Johnson established these auxiliary principles and did not change or limit the rule of Penry I itself was most clearly demonstrated by the Court’s decision in Buchanan. In that case, the Court held that the state trial court’s refusal to give instructions on the concept of mitigation and on particular statutorily defined mitigating factors did not violate the Eighth and Fourteenth Amendments. Id. at 276-78, 118 S.Ct. 757. The Court explained that the defendant, in arguing to the contrary, misunderstood the significant distinction it had drawn between the two phases of the capital sentencing process: the eligibility phase, in which the jury narrows the class of defendants eligible for the death penalty, and the selection phase, with which Buchanan was concerned, in which the jury determines whether to impose a death sentence on an eligible defendant. Id. at 275-76, 118 S.Ct. 757 (citing Tuilaepa v. California, 512 U.S. 967, 971-72, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994)). In explaining the eligibility and selection phases, the Court again ratified the Penry I rule and described the principles that had been generated by Johnson in terms that indicate the Court views them as supporting, rather than limiting, rules:
In the eligibility phase, the jury narrows the class of defendants eligible for the death penalty, often through consideration of aggravating circumstances. In the selection phase, the jury determines whether to impose a death sentence on an eligible defendant ....
.... It is in regard to the eligibility phase that we have stressed the need for channeling and limiting the jury’s discretion to ensure that the death penalty is a proportionate punishment and therefore not arbitrary or capricious in its imposition. In contrast, in the selection phase, we have emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individu *326 alized determination. Tuilaepa, supra, at 971-73, 114 S.Ct., at 2634-36; Romano v. Oklahoma, 512 U.S. 1, 6-7, 114 S.Ct. 2004, 2008-09, 129 L.Ed.2d 1 (1994); McCleskey v. Kemp, 481 U.S. 279, 304-06, 107 S.Ct. 1756, 1773-75, 95 L.Ed.2d 262 (1987); Stephens, supra, at 878-79, 103 S.Ct., at 2743-44....

In the selection phase, our cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence. Penry v. Lynaugh, 492 U.S. 302, 317-18, 109 S.Ct. 2934, 2946-47, 106 L.Ed.2d 256 (1989); Eddings v. Oklahoma, 455 U.S. 104, 113-14, 102 S.Ct. 869, 876-77, 71 L.Ed.2d 1 (1982); Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2951, 2961-65, 57 L.Ed.2d 973 (1978). However, the state may shape and structure the jury’s consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence. Johnson v. Texas, 509 U.S. 350, 362, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290 (1993); Penry, supra, at 326, 109 S.Ct., at 2951; Franklin v. Lynaugh, 187 U.S. 164, 181, 108 S.Ct. 2320, 2331, 101 L.Ed.2d 155 (1988). Our consistent concern has been that restrictions on the jm-y’s sentencing determination not preclude the jury from being able to give effect to mitigating evidence.

Id. at 275-76, 118 S.Ct. 757 (emphasis added).
Thus, as the Buchanan Court read Pen-ry I together with Johnson, Tuilaepa, Romano and other cases, the rule of Penry I is not limited by Johnson at all. Instead, the Penry I holding that the Eighth Amendment requires that a capital sentencing jury be able to consider fully and give effect to the defendant’s relevant mitigating evidence by selecting the appropriate sentence stands unlimited and unscathed by Johnson. Johnson, as read by Buchanan, merely establishes precedent for application of the Boyde test and adds that a State may shape and structure mitigation consideration so long as it does not prevent the sentencer from giving effect to the mitigating evidence.
Moreover, as pointed out earlier, since Johnson was decided, the Court in Penry II, Tennard, and Smith repeatedly reaffirmed the rule and holding of Penry I as Justice O’Connor described it, first, in Penry I itself, next, in her dissent in Johnson, again in the six-member majority of Penry II, and finally in Tennard. In her Johnson dissent, Justice O’Connor stated:
[In Penry 2], we plainly held that the Texas special issues violated the Eighth Amendment to the extent they prevented the jury from giving full consideration and effect to a defendant’s relevant mitigating evidence.
Penry was in no way limited to evidence that is only aggravating under the “future dangerousness” issue. We stated there that “Eddings makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence.” That we meant “full effect” is evident from the remainder of our discussion. We first determined that Penry’s evidence of mental retardation and his abused childhood was relevant to the question whether he acted deliberately under the first special issue. But having some relevance to an issue was not sufficient, and the problem was not, as the Court today suggests, simply that no jury instruction defined the term “deliberately.” Instead, we noted that the jury must be able to give effect to the evidence as it related to Penry’s “[p]er-sonal culpability,” which “is not solely a *327 function of a defendant’s capacity to act ‘deliberately.’ ” The jury could not give full effect to Penry’s evidence under the first special issue because “deliberately” was not defined “in a way that would clearly direct the jury to consider fully Penry’s mitigating evidence as it bears on his personal culpability.” That is, the evidence had relevance beyond the scope of the first issue.
Johnson, 509 U.S. at 385-86, 113 S.Ct. 2658 (O’Connor, J., dissenting) (alteration in original) (internal citations omitted).
Significantly, too, Justice Kennedy, Johnson’s, author, joined the six member majorities in Penry II and Tennard, and the seven member majority in Smith. Further, Tennard and Smith made clear that the rule of Penry I applies to all categories of mitigating evidence that are relevant to the assessment of a defendant’s diminished culpability or that might cause a jury through its reasoned moral response to select life imprisonment rather than a death sentence for the defendant. These decisions, along with Buchanan, have resoundingly ratified and continued to uphold Justice O’Connor’s view as expressed in Penry I that the Eighth Amendment requires that a capital sentencing jury be able to fully consider defendant’s relevant mitigating evidence by using that evidence to assess his moral culpability and to give full effect to that evidence by selecting the appropriate life or death sentence for him in that case.
Also, as the Court has made clear in Buchanan, Tennard, Smith, and other cases, the State’s ability to shape and structure the capital sentencer’s consideration of mitigation evidence may not be used to “preclude the jury from giving effect to any relevant mitigating evidence” by selecting the appropriate sentence for the offender in each case. Buchanan, 522 U.S. at 276, 118 S.Ct. 757. The Court emphasized its continued disapproval of the use of the Texas special issues to in any way “constrain” the jury’s ability to give effect to mitigation evidence by selecting the appropriate sentence. In comparing the Virginia sentencing system involved in Buchanan with the Texas system used in Penry I, the Court stated:
The instruction informed the jurors that if they found the aggravating factor proved beyond a reasonable doubt then they “may fix” the penalty at death, but directed that if they believed that all the evidence justified a lesser sentence then they “shall” impose a life sentence. The jury was thus allowed to impose a life sentence even if it found the aggravating factor proved. Moreover, in contrast to the Texas special issues scheme in question in Penry, the instructions here did not constrain the manner in which the jury was able to give effect to mitigation.
Id. at 277, 118 S.Ct. 757 (internal citation and footnote omitted).
Furthermore, as described earlier, the Court in Tennard and Smith emphatically held that state and inferior federal courts may not through judicial glosses or otherwise create ad hoc or common law type threshold or screening rules that cut short appellate review of death penalty cases and thus indirectly have the effect of approving and encouraging constraints upon the manner in which the capital sentencing juries are able to give full effect to relevant mitigating evidence in the selection of the appropriate death or life imprisonment sentence in individual cases.
The reaffirmation of Penry I’s rule that the capital sentencing jury be able to give both full consideration and full effect to relevant mitigating evidence, moreover, necessitates realigning the Boyde test analogue for application to the present case in which, allegedly, the capital sentencer was *328 incapable of either appropriately considering or giving effect to the defendant’s mitigating evidence for the purposes of individualized sentencing. Due to the marked differences between the Texas sentencing system in the present case and the California system in Boyde, the Boyde rule cannot be applied in precisely the same way to the alleged dual error in the present case.
In Boyde, although the jury was instructed that it must impose the death penalty if it found the aggravating circumstances to outweigh the mitigating circumstances and a life imprisonment sentence if it found vice versa, the jurors retained a great deal of discretion in that they could decide what weight to assign the aggravating and mitigating factors and they were fully enabled to make the ultimate choice of whether to impose or withhold the death penalty. Thus, the California system in Boyde was markedly different from the pre-1991 Texas system under which the jury was not legally authorized to choose between life and death sentences in any case. In Boyde, the defendant argued that although the jury retained significant sentencing discretion, his constitutional rights were violated because the jury was given an instruction that could have misled it into thinking it was not free to consider his mitigating evidence of background and character in deciding whether to impose the death penalty. Near the beginning of the Supreme Court opinion, Chief Justice Rehnquist reaffirmed the rule of Penry I: “The Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by petitioner.” Boyde, 494 U.S. at 378, 110 S.Ct. 1190. However, after that point the Boyde opinion does not refer to the “give effect” part of the rule as it was not genuinely at issue, the only real question being whether the allegedly ambiguous jury instruction had prevented the jury from “be[ing] able to consider ... all relevant mitigating evidence.” Id. The Court decided that the rule to be applied to such an alleged ambiguous jury instruction would be the “reasonable likelihood” test and, upon applying that test, concluded that there was no reasonable likelihood that Boyde’s jury had been precluded from considering the relevant background and character mitigation evidence. As Chief Justice Rehnquist explained:
In this case we are presented with a single jury instruction. The instruction is not concededly erroneous, nor found so by a court, as was the case in Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931). The claim is that the instruction is ambiguous and therefore subject to an erroneous interpretation. We think the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition. This “reasonable likelihood” standard, we think, better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical “reasonable” juror could or might have interpreted the instruction.
Id. at 380, 110 S.Ct. 1190.
Because the capital sentencing jury in the present case, like the jury in Penry I, was not free or able to choose a life imprisonment sentence for Nelson, the alleged constitutional deficiency here affected the jury’s ability to both “consider and give effect” to Nelson’s relevant mitigating evi *329 dence; it is not merely an alleged ambiguous jury instruction that could have affected only their understanding of the types of mitigating evidence that they could consider. Indeed, as I explain in the last section of this opinion, the constitutional deficiency here is a structural defect which affected the entire capital sentencing proceeding and cannot be analyzed for harmless error, i.e., the alleged binary defect is (1) the total absence of the jury’s ability to consider the mitigating evidence for purposes of assessing Nelson’s moral culpability or deathworthiness; and (2) the total absence of the jury’s ability to give the evidence effect by selecting the sentence it deems appropriate based on that assessment. Accordingly, if the Boyde test is to be applied by analogy in the present case, it must be adjusted to properly and completely fit both elements of the alleged constitutional violation here. Because, unlike the situation in Boyde, there is a serious question here whether the jury was precluded from giving effect to Nelson’s mitigating evidence, the proper inquiry here should be whether there is a reasonable likelihood that the jury was prevented from considering Nelson’s mitigation evidence to assess his culpability or giving effect to that evidence by selecting the appropriate sentence.
Because of the unique nature of the youth mitigation evidence at issue in Johnson, the Court there apparently considered that only an alleged failure in the jury’s ability to consider the evidence was at issue. The Court in Johnson must have concluded that the jury was fully capable of giving effect to the mitigating evidence by selecting the sentence if the jury instruction had not precluded them from giving it full consideration. Thus, the situations posing only unitary errors in both Boyde and Johnson were quite similar in this respect despite other differences in the two sentencing systems. Consequently, there was no need for the Court to consider further reshaping the Boyde test analogue that it derived from its Boyde decision. For all of these reasons, the Johnson Court’s use of a Boyde test analogue capable of testing only for a preclusion of the jury’s ability to consider the evidence should not prevent courts from reshaping the analogue test to make it suitable for detecting a preclusion of both the jury’s ability to consider and to give effect to relevant mitigating evidence.
Considering all of the foregoing reasons, I conclude that the Court’s decisions subsequent to Johnson demonstrate that neither it nor any other decision has been read as limiting or changing the constitutional requirements and principles established in Penny I.
5. Texas’ Pre-1991 Capital Sentencing Scheme Provided a Constitutionally Inadequate Vehicle for Jurors to Consider and Give Effect to the Mitigating Evidence that Nelson Presented.
As I explained above, by the time Nelson’s conviction became final in 1994, the relevant Supreme Court cases had clearly established that in order to constitutionally impose and carry out the death penalty, a capital sentencer must be enabled: (1) to make an individualized assessment of each defendant’s moral culpability and death-worthiness and (2) to give full effect to that evidence by selecting between either life imprisonment or death as the appropriate sentence.
In this case, Nelson presented evidence during the punishment phase of his trial that (1) he was rejected by his mother; (2) he abused drugs and alcohol; (3) he had troubled relationships with his brother and with women; (4) he had fathered a child, with whom he was not allowed to have a relationship; and (5) he suffered from bor *330 derline personality disorder. The state courts held that all of Nelson’s evidence could be adequately considered within the “deliberateness” and “future dangerousness” special issues.
It is abundantly clear that there is more than a reasonable likelihood that the jury was not permitted to fully consider and give effect to Nelson’s mitigating evidence, as the “deliberateness” and “future dangerousness” special issues did not permit the jury to consider how that evidence affected their assessment of Nelson’s moral culpability or to agree upon whether the death penalty or life imprisonment was the appropriate sentence in his case. There can be no question that Nelson’s mitigating evidence, particularly his evidence of a frequently disorienting borderline personality disorder, a medically recognized mental illness,[7] implicates his deathworthiness and his moral culpability. Nelson’s troubled background and mental disorder make him less morally culpable independently of the issues of whether he acted deliberately or would be a future danger. But “because the jury was only called upon to answer two relatively simple yes or no questions, there is no reason to suppose that it could or would consider the evidence for the complex purpose of assessing the comparative level of Nelson’s culpability.” Nelson, 442 F.3d at 306 (Dennis, J., concurring in the judgment). Accordingly, for the reasons set forth in my concurring panel opinion, I agree with the en banc majority that a Penny violation occurred in this case and that the state courts unreasonably applied clearly established federal law in denying Nelson’s claim.
6. The Restrictive Glosses Applied, At The Panel Level In This Case And Others Have No Basis In The Supreme Court’s Decisions.
As the Supreme Court made unmistakably clear in Tennard, this court is not permitted to artificially or ingeniously narrow Penny I by imposing screening tests or placing restrictive glosses on the Supreme Court’s jurisprudence. Tennard, 542 U.S. at 283-84, 124 S.Ct. 2562; see also Smith, 543 U.S. at 43-45, 125 S.Ct. 400. In Tennard, the Court admonished this circuit that its “constitutional relevance,” “uniquely severe permanent handicap,” and “nexus” tests were restrictive glosses that had “no foundation in the decisions” of the Supreme Court. Tennard, 542 U.S. at 284, 289, 124 S.Ct. 2562. As Tennard instructed, we are not permitted to alter or elaborate the tests outlined *331 by the Supreme Court so as to “fail to reach the heart of [a defendant’s] Penry claims.” Id. at 286, 124 S.Ct. 2562.
In holding that Nelson’s mitigating evidence could be considered within the context of the special issues, the state court and Chief Judge Jones’ panel opinion in this case erroneously relied on pre-Ten-nard Fifth Circuit precedent that, like the defunct “constitutional relevance” test, are unsupported by the Supreme Court’s cases. The state court and Chief Judge Jones’ panel opinion used such cases to find that both Nelson’s evidence concerning his background and troubled relationships and his evidence of voluntary intoxication could be sufficiently considered within the scope of the special issues. See Nelson, 442 F.3d at 285-86. In light of the clearly established law described above, however, it was error to rely on prior Fifth Circuit threshold and screening rules in those cases.
Even more troubling is Chief Judge Jones’ panel opinion’s resort to yet another of this circuit’s restrictive glosses on the Supreme Court’s Penry jurisprudence, in the form of the “treatable mental disorder” test, under which evidence of a mental disorder that is only theoretically treatable is not considered Penry evidence. Nelson, 442 F.3d at 287 (citing Coble v. Dretke, 417 F.3d 508 (5th Cir.2005)). Again, this test adds a gloss that has no basis in the Supreme Court’s decisions. This circuit’s rule that any theoretically non-permanent mental illness can be given the requisite effect through the Texas special issues is simply another contrivance to avoid the requirements of the Supreme Court’s individualized sentencing jurisprudence, and I agree with the majority that it should not be applied.[8]
In addition, I agree with the majority’s decision to reject the wholly-unfounded “double-edged” evidence rule. This court has sometimes used Johnson to deny Pen-ry claims by stating that Johnson adopted a so-called “double-edged” evidence rule, under which mitigating evidence does not trigger Penry scrutiny unless a juror considering the evidence could give it only aggravating, and not mitigating, effect under the special issues. See, e.g., Cole v. Dretke, 418 F.3d 494, 505-08 & n. 54 (5th Cir.2005), cert. granted sub nom., Abdul-Kabir v. Quarterman, — U.S. -, 127 S.Ct. 432, 166 L.Ed.2d 307 (2006). As the majority points out, although the Peni'y I court remarked that one of the problems with the application of the special issues to Penry’s case was that a juror could only find Penry’s evidence of mental retardation to be an aggravating factor, see Penry I, 492 U.S. at 324, 109 S.Ct. 2934, that observation was not the basis for the decision and Penry I is not therefore limited to such “double-edged” evidence. Moreover, as I explained in my dissent from the denial of rehearing en banc in Cole, nothing in the Court’s decision in Johnson or subsequent cases indicates that the Johnson court adopted such a rule. See Cole, 443 F.3d at 450-51 (Dennis, J., dissenting).
7. The State’s Failure To Enable Its Capital Sentencing Jury To Give Full Consideration And Effect To Nelson’s Relevant Mitigating Evidence Cannot Be Harmless Error.
i. The State Waived Its Harmless Error Argument.
The state did not argue that any Penry error in this case could be harmless until *332 its en banc brief in this court. Ordinarily, the state bears the burden of showing that a preserved error was harmless. See United States v. Dominguez Benitez, 542 U.S. 74, 81 n. 7, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004). In addition, the state can waive harmless error review by failing to raise the issue in a timely and unequivocal manner in the district court. See Sanders v. Cotton, 398 F.3d 572, 582 (7th Cir.2005); Lam v. Kelchner, 304 F.3d 256, 269-70 (3d Cir.2002); 2 Randy Hertz & James S. Liebman, Federal Habeas Corpus PRACTICE & PROCEDURE § 31.2, at 1512 & n. 1 (5th ed.2005); see also Saldano v. Roach, 363 F.3d 545, 554-55 (5th Cir.2004). Although a court retains the discretion to consider the harmless error issue even when it has been waived, it should generally do so only if the error’s harmlessness is clear from even a cursory review of the record and reversal for further proceedings would be nothing more than a waste of resources. See Sanders, 398 F.3d at 582; United States v. Giovannetti, 928 F.2d 225, 226-27 (7th Cir.1991). Whether the court should overlook the state’s waiver of harmless error in any particular case depends on “the length and complexity of the record, whether the harmlessness of the error or errors found is certain or debatable, and whether a reversal will result in protracted, costly, and ultimately futile proceedings in the district court.” Giovannetti, 928 F.2d at 227.
Although I did not consider the effect of the state’s failure to raise harmless error in my concurring panel opinion, I am now convinced that the state waived any argument concerning harmless error by failing to raise it in the district court. Moreover, applying the factors set out in Giovannetti, it is clear that this is not a case in which we should exercise our discretion to overlook that waiver. The record in Nelson’s case is substantial and the issues are complex; it is certainly debatable whether the trial court’s error is, or could ever be, harmless (indeed, I conclude below that such an error is reversible per se); and reversing Nelson’s death sentence and ordering a new sentencing proceeding at which the jury is permitted to fully consider Nelson’s mitigating evidence in determining the appropriate sentence cannot be considered a futile act. Accordingly, this court can properly conclude that the state has waived harmless error review and that this is not an appropriate case in which this court should disregard the state’s waiver.
ii. A Penny Error Is A Structural Defect That Is Not Susceptible To Harmless Error Review.
Under principles of law clearly established by the Supreme Court’s decisions, the constitutional violation in this case was a “structural defect” that cannot be analyzed as harmless “trial error.” This is because the violation was not a discrete error that a reviewing court can determine from the record had no substantial and injurious effect or influence on the jury’s determination of the sentence. Rather, the violation was the State’s failure in this case to enable its capital sentencing jury to give full effect to Nelson’s relevant mitigating evidence in determining the sentence.
The history and purpose of harmless error review demonstrates why it is inappropriate in this case. The dichotomy between errors of constitutional dimension that may be found to be harmless and those that may not began with Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In Chapman, the Supreme Court recognized that “there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error .... ” Id. at 23, 87 S.Ct. 824. The Court pointed to the *333 rule against coerced confessions,[9] the right to counsel,[10] the right to an impartial judge,[11] and, in a later case, the rule against double jeopardy,[12] as belonging to the list of constitutional rights so important that their violation requires automatic reversal. See 3B ChaRles Alan Weight et al. Federal PRACTICE & Prooedure § 855 (3d ed.2004). For errors that could be treated as harmless, Chapman established that the prosecution has the burden of showing that the error was harmless, and reversal is required unless the court is “able to declare a belief that it was harmless beyond a reasonable doubt.” Chapman, 386 U.S. at 24, 87 S.Ct. 824. The Chapman court warned against “ ‘overemphasis’ on the notion that error is harmless if there is overwhelming evidence of guilt.” 3B Wright et al., supra, at § 855. Later, in Bumper v. North Carolina, 391 U.S. 543, 550 n. 16, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), the Court struck a similar chord, emphasizing that “it is not the function of this Court to determine innocence or guilt, much less to apply our own subjective notions of justice. Our duty is to uphold the Constitution of the United States.”
Some twenty-four years after Chapman, building on the dichotomy it recognized, the Court in Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), developed a theory for distinguishing between constitutional “trial errors,” which can be harmless, and constitutional “structural defects,” which cannot. The Court explained that trial error “oceur[s] during the presentation of the case to the jury” and is amenable to harmless error analysis because it “may ... be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt.” Id. at 307-08, 111 S.Ct. 1246. At the other end of the spectrum of constitutional errors lie “structural defects in the constitution of the trial mechanism, which defy analysis by ‘harmless-error’ standards. The entire conduct of the trial from beginning to end is obviously affected by [structural defects such as] the absence of counsel for a criminal defendant [and] the presence on the bench of a judge who is not impartial.” Id. at 309-10, 111 S.Ct. 1246. The existence of a structural defect “affect[s] the framework within which the trial proceeds, rather than [being] simply an error in the trial process itself.” Id. at 310, 111 S.Ct. 1246. A structural defect “transcends the criminal process” because “ ‘[w]ithout these basic protections, a criminal trial cannot reliably serve its function ... and no criminal punishment may be regarded as fundamentally fair.’ ” Id. at 310, 311, 111 S.Ct. 1246 (quoting Rose v. Clark, 478 U.S. 570, 577-78, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986)).
In Fulminante, the Court also recognized that since Chapman it had added to the category of structural constitutional errors not subject to harmless error the following: “unlawful exclusion of members of the defendant’s race from a grand jury;”[13] “the right to self-representation at *334 trial;”[14] and “the right to public trial.”[15] In Fulminante itself, the Court held that the admission of a coerced confession is a trial error subject to harmless error analysis, reversing its prior classification in Chapman of that kind of error as a structural defect. Ultimately, however, a majority of the Fulminante court held that the error was not harmless beyond a reasonable doubt in that particular case and affirmed the Arizona Supreme Court’s decision to grant Fulminante a new trial. Id. at 297-302, 111 S.Ct. 1246.
Two years later, the Supreme Court in Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), a case on direct review, held that a constitutionally deficient reasonable doubt jury instruction, which carries with it “consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as a structural error.” Id. at 282, 113 S.Ct. 2078 (internal quotation marks omitted). As Justice Scalia explained, the harmless error question Chapman poses for reviewing courts is
not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand. Harmless-error review looks ... to the basis on which the jury actually rested its verdict. The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered — no matter how inescapable the findings to support that verdict might be — would violate the jury-trial guarantee.
Id. at 279, 113 S.Ct. 2078 (internal citations and quotation marks omitted). And, as he elaborated,
Since, for the reasons [just] described ..., there has been no jury verdict within the meaning of the Sixth Amendment, the entire premise of Chapman review is simply absent. There being no jury verdict of guilty-beyond-a-reasonable-doubt, the question whether the same verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly meaningless. There is no object, so to speak, upon which harmless-error scrutiny can operate. The most an appellate court can conclude is that a jury would surely have found petitioner guilty beyond a reasonable doubt — not that the jury’s actual finding of guilty beyond a reasonable doubt would surely not have been different absent the constitutional error. That is not enough. The Sixth Amendment requires more than appellate speculation about a hypothetical jury’s action, or else directed verdicts for the State would be sustainable on appeal; it requires an actual jury finding of guilty.
Id. at 280, 113 S.Ct. 2078 (internal citations omitted).
Also in 1993, the Supreme Court in Brecht changed the harmless error rule *335 that applies to habeas corpus cases, holding that, on collateral review of state court decisions, federal courts should apply the standard of the Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), which asks whether the error had a substantial and injurious effect on the verdict, rather than the Chapman harmless beyond a reasonable doubt standard, to decide whether a constitutional trial error was harmless. But the Brecht court did not alter, and in fact reaffirmed as longstanding, the rule that a constitutional structural defect is reversible per se and not subject to harmless error analysis. Citing Fulminante, the Court reiterated:
Tidal error “occur[s] during the presentation of the case to the jury,” and is amenable to harmless-error analysis because it “may ... be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial].” At the other end of the spectrum of constitutional errors lie “structural defects in the constitution of the trial mechanism, which defy analysis by ‘harmless-error’ standards.” The existence of such defects— deprivation of the right to counsel, for example — requires automatic reversal of the conviction because they infect the entire trial process. Since our landmark decision in Chapman v. California, we have applied the harmless-beyond-a-reasonable-doubt standard in reviewing claims of constitutional error of the trial type.
Id. at 629-30, 113 S.Ct. 1710 (alterations in original) (internal citations omitted).
Accordingly, in habeas corpus proceedings, even after Brecht, “structural” constitutional defects, as opposed to constitutional “trial errors,” are always considered “prejudicial” and reversible per se. Reviewing courts may not subject them to harmless error analysis or declare them to be harmless under any standard.
Applying the foregoing principles, I conclude that the constitutional violation that occurred when the pre-1991 Texas capital sentencing system was applied to a case in which a defendant had introduced mitigating evidence that reasonably may have caused a sentencer to impose a sentence of less than death, the violation was caused not by a “trial error” but by a “structural defect” that is not subject to harmless error analysis.
More specifically, the defect plainly is not a “trial error,” which “occur[s] during the presentation of the case to the jury,” and is amenable to harmless-error analysis. Fulminante, 499 U.S. at 307, 111 S.Ct. 1246. As Chief Justice Rehnquist explained in Fulminante, a “trial error” is one which “may ... be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt.” Fulminante, 499 U.S. at 307-08, 111 S.Ct. 1246. Under his analysis, a Penny I violation is not a “trial error” because it is impossible for a reviewing court to “quantitatively” assess what affect the mitigating evidence would have had on the sentencing jury if it had been granted the discretion to choose between a life or a death sentence for Penny. Instead, the defect is a “structural defect[ ] in the constitution of the trial mechanism, which deifies] analysis by ‘harmless-error’ standards. The entire conduct of the [sentencing] from beginning to end is obviously affected by” a structural defect in the sentencing framework. Id. at 309-10, 111 S.Ct. 1246. Consequently, Penny I held that the pre-1991 Texas capital sentencing scheme was unconstitutional as applied to that case and made clear that in a new capital sentencing proceeding the structural defect must be repaired so as to enable *336 the jury to fully consider Penny’s mitigation evidence and to decline to impose the death penalty if it decided that sentence to be inappropriate in Penry’s case.
That the constitutional violation in Pen-ry I and this case resulted from a “structural defect” that is not susceptible to harmless error analysis is even more clearly shown by applying Justice Scalia’s first analysis in Sullivan. According to Sullivan, as a court reviewing for harmless error, we are, instructed to consider “not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the ... verdict in the case at hand .... The inquiry, in other words, is not whether, in a [sentencing proceeding] that occurred without the error, a [death penalty] would surely have been [imposed], but whether the [death penalty actually imposed] in this [capital sentencing proceeding] was surely unattributable to the error.” Sullivan, 508 U.S. at 279, 113 S.Ct. 2078. Once the proper function of harmless error review is understood, “the illogic of harmless-error review in the present case becomes evident.” Id. at 280, 113 S.Ct. 2078. Since there has been no jury consideration of Nelson’s mitigating evidence for purposes of determining whether the death penalty is necessary for just retribution in his case, and no jury decision that the death penalty is indeed appropriate in his case, “the entire premise of [harmless error] review is simply absent.” Id. Because the jury could not fully consider the mitigating evidence and there was no jury decision upon whether the death penalty is appropriate here, the question of whether the same decision to impose the death penalty “would have been rendered absent the constitutional error is utterly meaningless.” Id. “The most [we] can conclude is that a jury would surely have foundT that Nelson deserves the death penalty — not that the actual imposition of the death penalty “would surely not have been different absent the constitutional error." Id. Such a determination on our part in the present case would be nothing more than appellate speculation about a hypothetical jury’s action, not a meaningful appellate harmless error analysis of Nelson’s jury’s actual determination to impose the death penalty.[16]
Having reached the foregoing conclusions after additional study and a better understanding of the applicable legal principles, I must acknowledge and correct the errors in the premise and the result of my separate panel opinion in this case.
My initial error resulted from my faulty appreciation of the correlation between (1) the Supreme Court’s statement in Johnson that “[t]he standard against which we assess whether jury instructions satisfy the rule of Lockett and Eddings was set forth in Boyde v. California.” Johnson, 509 U.S. at 367, 113 S.Ct. 2658; (2) the Court’s application by analogy of the Boyde test in Johnson to determine whether there was a Penry I constitutional violation; and (3) the Court’s holding in Calderon v. Coleman, 525 U.S. 141, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998), that once the court of *337 appeals had determined that the state trial court’s ambiguous jury instruction was a constitutional trial error under the Boyde test, it was bound to apply the harmless error analysis mandated by Brecht and find the error harmful before issuing a writ of habeas corpus. From these decisions, I incorrectly concluded that every Penry I constitutional violation detected by application of the Boyde test will be a “trial error” susceptible to harmless error analysis. This does not follow, however; on the contrary, it seems probable that most Penry I violations will be structural defects that are reversible per se, like the defect in the present case. By its nature a Penry I violation consists of the absence of the jury’s constitutionally required capability to consider and give effect to relevant mitigating evidence. Therefore, I conclude that after detecting a constitutional error by application of the Boyde test, it is necessary for us to analyze the particular constitutional deficiency according to the Supreme Court’s jurisprudential principles to determine if it is a structural defect which is reversible per se or a trial error that is susceptible to harmless error analysis under Brecht.
Second, having erroneously concluded that a harmless error analysis could be performed on the structural defect in this case, I unintentionally compounded my mistake by attempting to apply the Brecht test “to the hypothesizing of events that never in fact occurred. Such an enterprise is not factfinding, but closer to divination.” Dominguez Benitez, 542 U.S. at 86, 124 S.Ct. 2333 (2004) (Scalia, J., concurring). In other words, I could not examine the jury’s decision choosing the sentence in this case, because the jury here never made such a decision. Instead, I erroneously performed what I thought was a proper harmless error examination but which in reality was an improper hypothe-sization of what the jury would have done had it been enabled to give effect to the mitigating evidence by selecting the sentence.
For these reasons, the deprivation of the defendant’s right to a sentencing jury that was able to consider and give effect to all of his relevant mitigating evidence by selecting the appropriate sentence for him in the particular case, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as “structural defect”, not a “trial error.”

Conclusion

For these reasons, I concur in the judgment of the majority opinion.

. See, e.g., Cole v. Dretke, 443 F.3d 441, 442-51 (5th Cir.2006) (Dennis, J., dissenting); Nelson v. Dretke, 442 F.3d 282, 288-309 (5th Cir.2006) (Dennis, J., concurring in the judgment); Robertson v. Cockrell, 325 F.3d 243, 274-80 (5th Cir.2003) (en banc) (Dennis, J., dissenting); Tennard v. Cockrell, 284 F.3d 591, 597-604 (5th Cir.2002) (Dennis, J., dissenting); Penry v. Johnson, 215 F.3d 504, 513-16 (5th Cir.2000) (Dennis, J., dissenting). I am grateful to my law clerks who worked with me on these opinions and especially to three, Kevin Kneupper, Jelani Jefferson, and Bradley Meissner, who helped in preparing this en banc concurring opinion.

. In my dissent from a previous decision, I reached the same conclusion with respect to the Penry I violation in that case, i.e., that it was a structural defect, not a trial error, and therefore could not be subjected to harmless error analysis. See Hernandez v. Johnson, 248 F.3d 344, 378-81 (5th Cir.2001) (Dennis, J., dissenting). Later, however, I became dissuaded of that view by my imperfect understanding of the relationship between the Supreme Court's decisions in Johnson v. Texas, 509 U.S. 350, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993), Boyde v. California, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), Calderon v. Coleman, 525 U.S. 141, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998), and the Court’s structural defect/harmless error jurisprudence. After additional study and a better understanding of these Supreme Court decisions, I have returned to my original view that the type of constitutional violation here is a structural defect, not a trial error. I have set forth the reasons for my error and the need for its correction in the last section of this opinion dealing with the harmless error question.

. See Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).

. In Tuilaepa v. California, 512 U.S. 967, 971-72, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994), the Court recognized that there were two phases of the capital sentencing process: the “eligibility decision,’1 which serves to narrow the class of defendants eligible for the death penalty, and the "selection decision,” “where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence.”

. See also Tison v. Arizona, 481 U.S. 137, 156-57, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (clarifying scope of Enmund, and noting that “[a] critical facet of the individualized determination of culpability required in capital cases is the mental state with which the defendant commits the crime”).

. Under the Fifth Circuit’s rule at that time, to be constitutionally relevant, the defendant's mitigating evidence had to show (1) a uniquely severe permanent handicap with which the defendant was burdened through no fault of his own, and (2) that the defendant's criminal act was attributable to that severe condition.

. Nelson's expert psychiatric witness, Dr. Hickman, testified that his borderline personality disorder caused him to experience sudden, violent outbursts of emotion that clouded his judgment. See Nelson v. Dretke, 442 F.3d 282, 310-11 (5th Cir.2006) (Dennis, J., concurring in the judgment) (describing testimony about Nelson's psychological condition in detail). The fourth edition of the Diagnostic and Statistical Manual of Mental Disorders defines Borderline Personality Disorder as "[a] pervasive pattern of instability of interpersonal relationships, self-image, and affects, and marked impulsivity by early adulthood and present in a variety of contexts,” marked by five or more of the following: (1) "frantic efforts to avoid real or imagined abandonment”; (2) "a pattern of unstable and intense interpersonal relationships characterized by alternating between extremes of idealization and devaluation”; (3) "identity disturbance: markedly and persistently unstable self-image or sense of self”; (4) "impul-sivity in at least two areas that are potentially self-damaging”; (5) "recurrent suicidal behavior, gestures, or threats, or self-mutilating behavior”; (6) "affective instability due to a marked reactivity of mood”; (7) "chronic feelings of emptiness”; (8) "inappropriate, intense anger or difficulty controlling anger”; and (9) "transient, stress-related paranoid ideation or severe dissociative symptoms.” American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 709 (4th ed., text.rev., 2000).

. The Supreme Court recently granted certio-rari in a case involving this rule. See Brewer v. Dretke, 442 F.3d 273, 280 (5th Cir.) (stating that non-permanent mental illness does not give rise to a Penry claim), cert. granted, — U.S. —, 127 S.Ct. 433, 166 L.Ed.2d 307 (2006).

. Id. at 23 n. 8, 87 S.Ct. 824 (citing Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958)).

. Id. (citing Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)).

. Id. (citing Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927)).

. Price v. Georgia, 398 U.S. 323, 90 S.Ct. 1757, 26 L.Ed.2d 300 (1970).

. Id. at 310, 111 S.Ct. 1246 (citing Vasquez v. Hillery, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986)).

. Id. (citing McKaskle v. Wiggins, 465 U.S. 168, 177-78 n. 8, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984)).

. Id. (citing Waller v. Georgia, 467 U.S. 39, 49 n. 9, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984)). In addition to these categories, commentators have pointed to a number of rights that have been designated as "structural” by the Court and various lower courts, including the right to a speedy trial, a public trial, and the right to an appeal. See 2 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice & Procedure § 31.3, at 1521-30 (5th ed.2005).

. I am aware, of course, that Justice Scalia’s Sullivan analysis is based on the Sixth Amendment, while a Penry violation is based upon an Eighth Amendment defect in the framework of a capital sentencing proceeding. Nevertheless, I believe that the teachings of Sullivan are helpful and directly applicable to the question of whether a Pemy error is a structural defect not subject to harmless error analysis. As Sullivan acknowledges, its analysis is also fully consistent with Chief Justice Rehnquist’s more general analysis for determining whether a constitutional violation is a structural defect or a trial error in Fulminante, which is not tied to the Sixth Amendment or to any other specific constitutional amendment. See Sullivan, 508 U.S. at 281-82, 113 S.Ct. 2078.