**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-9002
_____

JUNIUS BURNO,
　　　　　　　Appellant

v.

COMMISSIONER, PENNSYLVANIA DEPARTMENT OF CORRECTIONS;
SUPERINTENDENT, SCI-GREENE; SUPERINTENDENT, SCI-ROCKVIEW;
LEHIGH COUNTY DISTRICT ATTORNEY'S OFFICE
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 5-15-cv-06307)
U.S. District Judge:  Gerald J. Pappert
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
April 9, 2024
_____

Before: SHWARTZ, RESTREPO, and ROTH, <u>Circuit Judges</u>

(Filed: April 17, 2024)
_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

SHWARTZ, Circuit Judge.

Junius Burno was found guilty of two counts of first-degree murder based in part on his statement to the police. Burno filed a federal habeas petition, asserting, among other things, that the trial court erred in not suppressing his statement. The District Court denied Burno's petition, and we issued a certificate of appealability ("COA") to review Burno's claims that: (1) his entire statement was involuntary and thus inadmissible; and (2) the portion of the statement he gave while his counsel was present was tainted by the part of the statement he made while his counsel was not. Because the Pennsylvania Supreme Court reasonably determined that Burno's statement was not involuntary and that the arrival of his counsel before the second half of his statement purged any possible taint, we will affirm.

A

Two men shot and killed Carlos Juarbe and Oscar Rosado in an apartment in Allentown, Pennsylvania. After Burno learned that the police wanted to speak with him about the murders, he turned himself in. Burno's counsel negotiated a plea deal on his behalf that, in exchange for a complete and truthful statement and testimony against his co-defendant, Terrence Bethea, the Commonwealth of Pennsylvania would not seek the death penalty. Burno agreed to the terms, and on September 24, 2003, he was advised of his Miranda rights and made a statement to the police with his counsel present, during which he admitted some involvement in the crime, but denied being present when the murders were committed (the "September 24 statement").

2

The police thereafter asked Burno to take a polygraph test, which he agreed to do on September 26, 2003. Burno was again advised of his Miranda rights and given the test without his counsel present. After Burno was informed he failed, he told the polygraph examiner that nobody could save him now, to which the examiner responded, "if a person tells the truth, they will definitely help themselves." JA 122. Burno then asked to speak to his attorney. The police attempted to contact his attorney, Glenn Clark, but were unable to reach him. Maria Dantos, the First Assistant District Attorney, informed Burno that they were trying to contact Clark. She described Burno as "distraught" and "talking about the rest of his life." JA 121.

Burno then spoke on the phone with Clark. Clark gave Dantos and the detectives permission to speak with Burno without Clark present. Dantos then spoke with Burno. During their conversation, Burno "apologiz[ed] for having lied, . . . talk[ed] about his family, and the good people in his life, and what he had done, and his remorse over having to . . . face what he had done." JA 118. Dantos testified that she told Burno, "you no longer have a deal, but you can work from here. Let's start from here. Give us the truth, testify and we will see where we are." JA 118. Burno was again provided with Miranda warnings and agreed to give the police a statement without Clark present (the "September 26 statement"). Detective Wayne Simock, who was present during the September 26 statement, testified that Burno said multiple times that "his life was in [the

3

detective's] hands," and "[t]hat [Burno] believed [that] with his cooperation, that death would be off the table, and that he would receive a life sentence."[1, 2]  JA 109.

Clark arrived about two hours and thirty minutes after the statement began. Before Clark's arrival, Burno told police that he lied during his September 24 statement and admitted that he shot Rosado and Juarbe.  When the police were told Clark arrived, they stopped the interview and Clark was given a chance to speak with Burno.[3]  The interview resumed approximately fifty-four minutes later.  During this second portion of the interview, Burno confirmed details he provided during the first portion of his statement, including that he and Bethea went to Juarbe's apartment to take Juarbe's drugs and money and that he shot both Rosado and Juarbe.

Burno was charged with the murders and moved to suppress his September 26 statement under the Fifth, Sixth, and Fourteenth Amendments and under Article I, Section 9 of the Pennsylvania State Constitution for several reasons, including that (1) the statement was involuntary because his attorney was not present for the first portion of the statement; and (2) the second portion of the statement was tainted by his attorney's

---

[1] Detective Simock testified that this happened "during the second interview," referring to the September 26 statement, JA 108-09, but it was not captured on the video recording.

[2] After Burno gave the September 26 statement, it appears his plea deal, under which Dantos agreed to seek life imprisonment rather than the death penalty, was again available to him under the condition that he testify against Bethea.  Burno ultimately refused to testify against Bethea, and Dantos informed him the deal was withdrawn.

[3] Although Burno testified that when Clark arrived, he tapped him on the shoulder, sat down, and taping resumed, the video of the statement shows that Burno confirmed that he "had the opportunity to talk to [his] attorney" before the discussion resumed. Trial Ex. 76 at 1.

4

absence during the first portion. The trial court found that the first portion of his statement was inadmissible because it was secured outside his counsel's presence, but that the second portion was admissible because Clark was present.

Burno proceeded to trial. During the trial, the evidence included: (1) a recording of Burno's September 24 statement; (2) a video of the second portion of Burno's September 26 statement; and (3) prison tapes of phone calls that Burno made to his wife and a friend that included details about the crime consistent with the September 26 statement.

Burno also testified and stated, as he had in his September 24 statement, that he was in the car when the shooting occurred, and that he eventually told police that he shot the men only because he thought that if he told the police what he thought that they wanted to hear, then he would be able to negotiate a deal. On rebuttal, the Commonwealth introduced, as impeachment evidence, the suppressed first portion of his September 26 statement in which he (1) said he lied during his September 24 statement and (2) admitted that he shot both men.

The jury convicted Burno of two counts of first-degree murder, and the trial court imposed two death sentences.

B

Burno filed a post-sentence motion raising numerous claims of error, including that the entire statement was involuntary and that the second portion of his September 26 statement should have been suppressed as fruit of the poisonous tree ("fruits doctrine").

5

After proceedings unrelated to the September 26 statement, the trial court denied

Burno's post-sentence motions, and the Pennsylvania Supreme Court affirmed.[4]  The

court noted that no party appealed the ruling that the first portion of the statement was

inadmissible but concluded that all portions of the statement were voluntary under the

totality-of-the-circumstances test.[5]  Commonwealth v. Burno, 154 A.3d 764, 789-90 (Pa.

2017).  These circumstances showed that: (1) Burno had the assistance of counsel at

every stage of the process, including the negotiation of the initial plea deal; (2) Clark

advised Burno to provide a truthful statement; (3) Clark was consulted before and after

Burno took the polygraph test; (4) Clark allowed the detectives to begin the September 26

interview without him; (5) Clark was with Burno during the second portion of his

September 26 statement; (6) the detectives gave Burno Miranda warnings on three

separate occasions; and (7) there was no indication that Burno did not understand his

rights or was forced to speak with the police.  Id. at 790.  From these facts, the court

concluded that (1) "Burno acted of his own free will and/or on the advice of counsel;"

---

[4] Burno appealed the trial court's decision directly to the Pennsylvania Supreme Court rather than to the Pennsylvania Superior Court.  See Notice of Appeal to the Supreme Court, Commonwealth v. Burno, No. CP-39-CR-0003637-2003 (Pa. Ct. Com. Pl. filed Oct. 14, 2015).

[5] The court noted that under Pennsylvania law, "[t]he governing consideration regarding the admissibility of a confession is voluntariness, which [the court] determine[s] based upon the totality of the circumstances," including "'the duration and means of interrogation; the defendant's physical and psychological state; the conditions attendant to the detention; the attitude exhibited by the police during the interrogation; and any other factors which may serve to drain one's powers of resistance to suggestion and coercion,'" Burno, 154 A.3d at 790 (quoting Commonwealth v. Perez, 845 A.2d 779, 787 (Pa. 2004)).  The court did not cite federal law, but as discussed herein, the law cited mirrors federal law.

(2) none of the interrogations was extensive or conducted in a way that "debilitated or weakened Burno's psychological functions"; (3) there was no evidence the police threatened, abused, or used unduly coercive tactics against Burno; and (4) the statement was the result of Clark and Burno's "collaborative effort" to obtain a favorable plea deal. Id. The court also concluded that Dantos's conversation with Burno did not render his statement involuntary because Burno's expressions of regret initiated the discussions about the case, and neither Dantos' nor the polygraph examiner's interactions with Burno were coercive. Id. at 790-91.

The court also held that the second portion of Burno's statement was not tainted by the first portion of the statement, which was illegally obtained. Id. at 788-89 (quoting Wong Sun v. United States, 371 U.S. 471, 486 (1963)).[6] The court found that (1) Burno had been advised of his Miranda rights and, "by all other indications, was acting of his own free will"; (2) Clark's arrival, and Burno's consent to continue with the interrogation, was an intervening event that removed the taint and "broke the chain of events so as to insulate the second statement from the first"; and (3) the police misconduct in proceeding with the first part of the interview in Clark's absence was not purposeful or flagrant as (a) the police relied on Clark's permission to speak with Burno

---

[6] The court cited federal law when it identified the factors used for determining whether an original taint has been sufficiently purged: "(1) whether Miranda warnings were given; (2) the 'temporal proximity' of the illegal police conduct to the confession; (3) the presence of intervening circumstances or events; and (4) the 'purpose and flagrancy of the official misconduct.'" Burno, 154 A.3d at 789 (quoting Commonwealth v. Green, 581 A.2d 544, 550-51 (Pa. 1990) (citing Brown v. Illinois, 422 U.S. 590, 603-04 (1975))).

7

in his absence, (b) nothing in the recorded statement showed that police coerced Burno to make his statements, and (c) the police did not force Burno to make admissions in the second portion of his statement based solely on the statements he made in the first portion of his statement. Id. at 789.

Burno declined to pursue relief under the Pennsylvania Post Conviction Relief Act, 42 Pa. Cons. Stat. § 9542 et seq., and instead filed a pro se habeas petition under 28 U.S.C. § 2254, which the District Court denied. Burno v. Wetzel, No. 15-06307, 2021 WL 3288654 (E.D. Pa. Aug. 2, 2021). The Court held that the state court did not violate clearly established federal law in failing to suppress the second half of Burno's September 26 statement, and that even if it had, the error was harmless. Id. at *25, 28. The District Court explained that the Pennsylvania Supreme Court's determination that Burno's statements were voluntary was not an unreasonable application of federal law to the facts, as the only evidence it found to support Burno's allegation that he was coerced was his meeting with Dantos outside the presence of counsel. Id. at *25-26. Regarding Burno's fruits doctrine argument, the District Court concluded that: (1) the United States Supreme Court has only applied the fruits doctrine to suppress statements that occur after an initial confession was provided in violation of the Sixth Amendment but not to those given in violation of the Fifth Amendment, id. at *28; and (2) the Pennsylvania Supreme Court reasonably applied the governing standard under Brown v. Illinois, 422 U.S. 590 (1975), when it determined that the use of the second statement did not violate the fruits doctrine, id. at *28-31.

8

Burno requested a COA, which we granted to review whether the state court erred in failing to suppress (1) his entire September 26 statement because it was coerced and (2) the second portion of his September 26 statement because it was allegedly the fruit of the illegally obtained first part of his statement.

II[7]

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), an application for a writ of habeas corpus will not be granted unless the adjudication of the claim on the merits in the state court proceedings resulted (1) "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under 28 U.S.C. § 2254(d)(1), "[a] state court decision is contrary to clearly established federal law if it applies a rule that contradicts the governing law set forth in Supreme Court precedent or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from that reached by the Supreme Court." Eley v. Erickson, 712 F.3d 837, 846 (3d Cir. 2013) (citations, internal quotation marks, and alterations omitted). "A state court decision is 'an unreasonable application' of clearly established federal law if it

_____

[7] The District Court had jurisdiction under 28 U.S.C. § 2254. This Court has jurisdiction under 28 U.S.C. § 2253(a).

'correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case.'" Id. (quoting Williams v. Taylor, 529 U.S. 362, 407-08 (2000)). Habeas relief is not appropriate merely because the state court's decision applied federal law incorrectly; "[r]ather, that application must be objectively unreasonable." Id. (quoting Renico v. Lett, 559 U.S. 766, 773 (2010)).

Under 28 U.S.C. § 2254(d)(2), an "unreasonable determination of the facts" requires that the state court's factual findings are "objectively unreasonable in light of the evidence presented in the state-court proceeding." Id. (citation omitted). The factual determinations of the state courts are presumed correct, and the petitioner must rebut this presumption by clear and convincing evidence. Id.

A

Burno asserts that the Pennsylvania Supreme Court unreasonably applied federal law because his full September 26 statement was coerced by his meetings with Dantos.[8] To determine whether a statement is voluntary, we "must consider the effect that the totality of the circumstances had upon the will of the defendant." Miller v. Fenton, 796 F.2d 598, 604 (3d Cir. 1986). The totality of the circumstances includes "both the

---

[8] Respondents argue that any challenge to the first part of Burno's September 26 statement is procedurally defaulted and waived because Burno did not exhaust such a claim on direct appeal or raise it in the District Court. However, Burno asserted both on direct appeal and in his habeas petition that the statement should have been suppressed "in its entirety" due to coercion. Brief for Appellant at 41-42, Commonwealth v. Burno, No. 716-CAP-2015 (Pa. filed Oct. 23, 2015); Pro Se Petitioner's Memorandum of Law in Support of Petition for Writ of Habeas Corpus at 97-98, Burno v. Comm'r, No. 5-15-cv-6307 (E.D. Pa. filed May 31, 2018).

characteristics of the accused and the details of the interrogation." Lam v. Kelchner, 304 F.3d 256, 264 (3d Cir. 2002) (quoting Dickerson v. United States, 530 U.S. 428, 434 (2000)). Here, Burno does not assert that his age, intelligence, or length of questioning contributed to his will being overborne. See Miller, 796 F.2d at 604 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). Nor does he claim that the police who questioned him were abusive in any way. Id. Rather, he asserts that Dantos' statements to him concerning the status of his plea deal coerced him to confess to the murders.

The test for voluntariness "generally recognize[s]" that law enforcement may use "some psychological tactics in eliciting a statement from a suspect," such as "play[ing] on the suspect's sympathies or explain[ing] that honesty might be the best policy for a criminal who hopes for leniency from the state." Id. at 605. Such tactics "may play a part in the suspect's decision to confess, but so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary." Id. The question here, therefore, is whether the Pennsylvania Supreme Court reasonably concluded that Dantos' statements were not "so . . . coercive that they deprived [Burno] of his ability to make an unconstrained, autonomous decision to confess." Id.; see also Halsey v. Pfeiffer, 750 F.3d 273, 304 (3d Cir. 2014) ("[T]he ultimate question is whether the defendant's will was overborne when he confessed." (quotation marks omitted)).

The Pennsylvania Supreme Court applied clearly established federal law and reasonably concluded that Burno's September 26 statement was voluntary. First, the

11

Pennsylvania Supreme Court considered the factors set forth in United States Supreme Court precedent for determining whether a statement is voluntary. Compare Burno, 154 A.3d at 790 (identifying the relevant factors as including the "duration and means of interrogation; the defendant's physical and psychological state; the conditions attendant to the detention; the attitude exhibited by the police during the interrogation; and any other factors which may serve to drain one's powers of resistance to suggestion and coercion") with Miller, 796 F.2d at 604 (quoting Schneckloth, 412 U.S. at 226, and noting the relevant considerations for coercion include "the youth of the accused; his lack of education or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep"); see also Withrow v. Williams, 507 U.S. 680, 693 (1993) (considering "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health" in making a coercion determination (citations omitted)).

Second, the court's factual findings concerning voluntariness are supported by the record, which shows that: (1) Burno was provided his Miranda warnings at least three times, including at the beginning of the September 26 statement itself, he had the assistance of counsel at every stage of the process, counsel was present for the second half of his September 26 statement, and there were no facts suggesting that Burno did not understand his rights, (2) the September 26 sessions were not unduly lengthy, lasting a

12

total of three hours and fifty-five minutes, including a fifty-four-minute break during which Burno conferred with counsel, (3) the sessions were not conducted "in a way that debilitated or weakened Burno's psychological functions," and (4) there was "no evidence that the police were threatening, abusive, or unduly coercive." Burno, 154 A.3d at 790.

The court also reasonably concluded that Burno's conversations with Dantos did not render the September 26 statement involuntary. There is no dispute that Dantos told Burno that the September 24 deal was void, but this declaration did not render Burno's statement involuntary. The September 24 plea deal required that Burno provide a truthful statement and testify against Bethea, and if he did so, then Dantos would not seek the death penalty. Burno thereafter failed the polygraph, which naturally caused him to believe that he "was in trouble" in that he "could not maybe get the deal that [he] was trying to get at that time," namely the plea deal that excluded the death penalty. JA 139.[9] This was a logical belief from his polygraph results, and not based solely on Dantos's

---

[9] Burno testified that when Dantos came to inform him that the police were trying to contact Clark, Dantos was "trying to scare [him] with being on death row," JA 139-40, and that Dantos and Clark both told him that if he gave a statement, the death penalty would be off the table. The Pennsylvania Supreme Court concluded that "Dantos sought only to inform Burno that she was trying to contact Attorney Clark and that she was unable to reach him at that moment," and that "[i]t was Burno's conduct that spawned any discussions regarding the case." Burno, 154 A.3d at 791. The factual findings of the state court are "presumed to be correct." 28 U.S.C. § 2254(e)(1). Burno points to nothing other than his own testimony to support his assertion that Dantos met with him to obtain a confession, or that she explicitly promised him that the death penalty would again be off the table if he confessed. Because this testimony does not rebut the presumption that the state court fact finding was correct by "clear and convincing evidence," id., we must accept the state court's finding.

13

comment to Burno after he failed the polygraph that he "no longer ha[d] a deal, but [he could] work from here. Let's start from here. Give us the truth, testify and we will see where we are." JA 118, 122. Dantos thereby only confirmed what Burno believed would occur and opened the door for him to start negotiating anew. The statements he made thereafter "may have been made in the hope of leniency, but that does not mean that it was made in response to a promise of leniency." Miller, 796 F.2d at 610. Thus, the state court did not unreasonably apply federal law in concluding that Burno's statement was voluntary as there is nothing to show that Burno's "decision to [make a statement] . . . [was not] a product of [his] own balancing of competing considerations." Id. at 605; see also id. ("[T]he interrogator may play on the suspect's sympathies or explain that honesty might be the best policy for a criminal who hopes for leniency from the state.").

For these reasons, the Pennsylvania Supreme Court's determination that Dantos's statement was voluntary was not an objectively unreasonable application of federal law.[10]

---

[10] There is other evidence concerning the September 26 statement, but it does not show that the Pennsylvania Supreme Court's conclusion was "so obviously wrong." Shinn v. Kayer, 141 S. Ct. 517, 523 (2020) (per curiam). The record shows: (1) Burno agreed to give his statement after he had been informed that he failed the polygraph test; (2) after he was informed that he had failed, Burno stated to the polygraph examiner that nobody could save him now, to which the polygraph examiner responded "if a person tells the truth, they will definitely help themselves," JA 122, which differs slightly from the state court's characterization of his statement; (3) Dantos spoke with Burno after he was told he failed the polygraph test and Dantos described Burno as "distraught, and he was talking about the rest of his life," JA 121, and he was apologizing for lying, **JA 121**; (4) Burno testified that he remembers Dantos "was trying to scare [him] with being on death row," JA 117; (5) Dantos testified that Burno said that he "just need[ed] to see some light at the end of [the] tunnel," JA 117; and (6) Detective Simock testified that during the September 26 statement Burno said multiple times that "his life was in [the detectives'] hands," and "[t]hat he believed [that] with his cooperation, that death would

14

B

Burno also argues that the trial court should have suppressed the second portion of the September 26 statement because it was tainted by the fact that the first portion of his statement was secured outside the presence of his counsel, which he claims violates both the Fifth and Sixth Amendments. Even assuming the fruits doctrine extends to both Fifth and Sixth Amendment violations,[11] the Pennsylvania Supreme Court reasonably

be off the table, and that he would receive a life sentence," JA 109. For us to disturb the state court's decision, Burno must show "far more than that the state court's decision was merely wrong or even clear error," but rather "that the state court's decision is so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement." Shinn, 141 S. Ct. at 523 (citations omitted). These facts do not satisfy that standard and so we will not disturb the state court's ruling based upon them.

[11] Although the fruits doctrine applies to violations of the Sixth Amendment right to counsel, see United States v. Wade, 388 U.S. 218, 241 (1967); Nix v. Williams, 467 U.S. 431, 442 (1984), the United States Supreme Court has not directly addressed whether the fruits doctrine applies to evidence obtained as a result of a Fifth Amendment violation of Minnick v. Mississippi, 498 U.S. 146 (1990), which provides that once a suspect requests counsel, questioning must cease until counsel is physically present. The Court has declined to extend the doctrine to Fifth Amendment Miranda violations, see, e.g., Oregon v. Elstad, 470 U.S. 298, 306-07 (1985) (holding that Fifth Amendment Miranda violations do not require that fruits of otherwise voluntary statements be suppressed as tainted); see also United States v. Patane, 542 U.S. 630, 643-44 (2004) (declining to apply the fruits doctrine to physical evidence recovered due to information obtained in an unwarned but voluntary statement), and our sister circuit courts have held that the fruits doctrine does not apply to an Edwards or Minnick violation. See, e.g., Howard v. Moore, 131 F.3d 399, 413 (4th Cir. 1997) (holding that the fruits doctrine is inapplicable to an Edwards violation, which makes it illegal for police to reinitiate questioning an in-custody suspect who requested counsel until counsel is provided), abrogated on other grounds by Miller-El v. Dretke, 545 U.S. 231 (2005); United States v. Mendoza-Cecelia, 963 F.2d 1467, 1475 (11th Cir. 1992) ("A violation of only Miranda's prophylactic procedures will therefore render inadmissible a statement otherwise voluntary within the meaning of the Fifth Amendment, . . . but will not exclude a subsequent confession under the 'fruit of the poisonous tree' doctrine." (citation omitted)), abrogated on other grounds by Coleman v. Singletary, 30 F.3d 1420 (11th Cir. 1994). Given the lack of a clear statement from the Supreme Court about whether the

15

concluded that the taint from the illegally secured portion of the statement was purged when Burno's counsel arrived.

Under the fruits doctrine, evidence obtained as a result of an illegally obtained statement is subject to suppression unless there is "an act of free will" demonstrating that the subsequent statement was not the product of an involuntary statement. Brown, 422 U.S. at 599. To determine whether a later event purges the taint from an inadmissible prior statement, or put differently, shows that the later statement was not the product of the coerced statement, courts consider (1) whether Miranda warnings were given, (2) "the purpose and the flagrancy of the official misconduct," (3) "the presence of intervening circumstances," and (4) "the temporal proximity" of the illegally obtained statement and the subsequent statement. Id. at 603-04.

The Pennsylvania Supreme Court considered these factors and reasonably concluded that any taint from the first portion of the statement was purged. First, although Miranda warnings were not repeated when Clark arrived, Burno was given Miranda warnings before the first portion of his statement and on two previous occasions. JA 122, 189-90.

---

fruits doctrine applies to Fifth Amendment violations based upon noncompliance with a prophylactic rule, we cannot say the Pennsylvania Supreme Court erred in concluding that the second portion of the September 26 statement was not an inadmissible fruit of an unconstitutionally obtained statement, regardless of whether that statement was inadmissible due to a Fifth Amendment or Sixth Amendment violation.

16

Second, there was no evidence of purposeful police misconduct. Id. at 604. The police contacted Clark, who consulted with Burno over the phone and told the police that they could speak with Burno in his absence. JA 118-19. While proceeding in the absence of his counsel violated Minnick v. Mississippi, 498 U.S. 146, 153 (1990) (holding that once a suspect requests counsel, interrogation must cease until counsel is physically present, regardless of whether the suspect has consulted with his attorney), the police's actions in contacting Clark and receiving his permission to speak to Burno, together with the fact that they re-Mirandized Burno and ensured that he was given access to his counsel as soon as counsel arrived, all undermine any inference of intentional misconduct. Moreover, there is nothing on the video showing that the police engaged in any coercive tactics, nor did they force Burno to repeat statements he made during the first portion of the interview for nefarious purposes. Rather, they simply asked him about his statements in Clark's presence.

Third, and most importantly, a fifty-four-minute break occurred after Clark arrived, during which Clark and Burno privately conferred. Clark's arrival and his private discussion with Burno were intervening events that broke the chain between the first and second portion of the statement and thereby insulated the second portion from any illegality that occurred in securing the first portion. Although one may view the temporal proximity between the two portions of Burno's statements as making it less likely that the taint from the first portion of the statement was purged, it is significant that the only error the trial court found to support suppression of the first portion of Burno's

17

statement was the absence of counsel. JA 294. Clark's arrival cured that problem, and thus there was "a sufficient break in events to undermine the inference that the confession was caused by the [constitutional] violation." Oregon v. Elstad, 470 U.S. 298, 306 (1985); see also United States v. Bayer, 331 U.S. 532, 540-41 (1947) ("Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. . . . But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use[] perpetually disables the confessor from making a usable one after those conditions have been removed."); United States v. Wellins, 654 F.2d 550, 555 (9th Cir. 1981) ("The crucial factor in this case is that [the defendant] was permitted to consult with his attorney.").

In short, the Pennsylvania Supreme Court applied clearly established federal law in an objectively reasonable manner by finding that Clark's arrival and Burno's opportunity to confer with him ensured that the second portion of the September 26 statement was "sufficiently an act of free will to purge the primary taint." Brown, 422 U.S. at 599. Thus, the state court did not err in concluding that the second portion of the statement was admissible.

### III

For the foregoing reasons, we will affirm the District Court's order.